114 T.C. No. 2

UNITED STATES TAX COURT

CAROL M. READ, ET AL.,[1] Petitioners v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos. 19001-97, 19322-97,     Filed February 4, 2000.
         19328-97.


     W and H, who were married, owned all of the vot-
ing, and virtually all of the nonvoting, stock of X
corporation (X).  They divorced, and the final judgment
dissolving their marriage (divorce judgment) ordered
(1) that W sell and convey to H, or at H's election to
X or X's ESOP plan, all of her X stock, (2) that H, or
at H's election X or X's ESOP plan, pay a stated amount
of cash to W simultaneously with the sale and convey-
ance of such stock, and (3) that as additional consid-
eration H, or at H's election X or X's ESOP plan,
deliver to W a promissory note bearing 9-percent inter-
est for the balance of the purchase price of that
stock.  Pursuant to the divorce judgment, H elected
(1) that the sale and conveyance of all of W's X stock

[1]Cases of the following petitioners are consolidated here-
with:  Mulberry Motor Parts, Inc., docket No. 19322-97, and
William A. Read, docket No. 19328-97.

be made to X, instead of to H, (2) that X, instead of H, pay the stated amount of cash to W simultaneously with that sale and conveyance, and (3) that X, instead of H, issue a promissory note to W bearing 9-percent interest for the balance of the purchase price. Thereafter, pursuant to H's election under the divorce judgment, W sold and transferred to X, instead of to H, all of the X stock that she owned.

Sec. 1041(a), I.R.C., provides that no gain or loss is to be recognized on a transfer of property by an individual to a spouse or a former spouse but only if the transfer to the former spouse is incident to the divorce. Sec. 1.1041-1T(c), Q&A-9, Temporary Income Tax Regs. (Q&A-9), 49 Fed. Reg. 34453 (Aug. 31, 1984), addresses a transfer of property by a spouse (transferring spouse) to a third party on behalf of a spouse or former spouse (nontransferring spouse). Provided that the other requirements of that temporary regulation and sec. 1041, I.R.C., are satisfied, Q&A-9 treats such a transfer as a transfer of property by the transferring spouse directly to the nontransferring spouse that qualifies for nonrecognition treatment under sec. 1041, I.R.C., and an immediate transfer of the property by the nontransferring spouse to the third party in a transaction that does not qualify for nonrecognition treatment under sec. 1041, I.R.C.

Petitioners argue that the legal standard that must be applied in order to determine whether W's transfer of her X stock to X was a transfer to a third party on behalf of H within the meaning of Q&A-9 is the primary-and-unconditional-obligation standard established by constructive-dividend decisional law. However, they disagree as to whether the primary-and-unconditional-obligation standard is satisfied as to Mr. Read in the instant cases.

1. <u>Held</u>: The primary-and-unconditional-obligation standard is not an appropriate standard to apply in order to determine whether W's transfer of her X stock to X was a transfer of property by W to a third party on behalf of H within the meaning of Q&A-9. <u>Held</u>, <u>further</u>, the primary-and-unconditional-obligation standard is not an appropriate standard to apply in any case involving a corporate redemption in a divorce setting in order to determine whether the transfer of property by the transferring spouse to a third party is on behalf of the nontransferring spouse within the meaning of Q&A-9.

2. <u>Held</u>, <u>further</u>, applying the common, ordinary

meaning of the phrase "on behalf of" in Q&A-9, W's transfer of her X stock to X was a transfer of property by W to a third party on behalf of H within the meaning of that temporary regulation.  <u>Held</u>, <u>further</u>, pursuant to sec. 1041(a), I.R.C., no gain shall be recognized by W as a result of that transfer.

<u>Mark A. Brown</u>, for petitioner in docket No. 19001-97.

<u>Karen E. Lewis</u> and <u>D. Michael O'Leary</u>, for petitioners in docket Nos. 19322-97 and 19328-97.

<u>Robert W. Dillard</u>, for respondent.

OPINION

CHIECHI, <u>Judge</u>:  These cases are before us on cross-motions for partial summary judgment filed by Carol M. Read (Ms. Read) and by William A. Read (Mr. Read) and Mulberry Motor Parts, Inc. (MMP).[2]  (We shall refer to the motion for partial summary judgment filed by Ms. Read as Ms. Read's motion, to the motion for partial summary judgment filed by Mr. Read and MMP as Mr. Read's and MMP's motion, and collectively to those two motions as the cross-motions for partial summary judgment.)

A partial summary adjudication may be made that does not

_____

[2]Ms. Read incorrectly characterized her motion as a motion for summary judgment.  However, in addition to the determination in the notice of deficiency (notice) issued to Ms. Read that we address in this Opinion, respondent made two other determinations in that notice, one of which respondent conceded and the other of which is computational.  Consequently, we have recharacterized Ms. Read's motion as a motion for partial summary judgment.

dispose of all the issues in a case if, inter alia, it is shown that there is no genuine issue as to any material fact with respect to the question(s) on which partial summary adjudication is sought.  See Rule 121(b).[3]  We are in agreement with the parties that there are no genuine issues of material fact and that the facts material to the Court's disposition of the cross-motions for partial summary judgment are set forth in those paragraphs of the stipulation of facts and those exhibits attached to that stipulation, which the Court made part of the record in these cases on November 5, 1998.

At the time they filed their respective petitions, Ms. Read resided in San Francisco, California, Mr. Read resided in Lakeland, Florida, and MMP's principal place of business was in Bartow, Florida.

In 1985, Ms. Read filed a petition for dissolution of her marriage to Mr. Read (marriage dissolution action) in the Circuit Court of the Tenth Judicial Circuit of the State of Florida, Polk County (Florida court).  At the time she filed that petition, Ms. Read owned 1,200 shares of voting and 12,000 shares of nonvoting, and Mr. Read owned 1,300 shares of voting and 13,000 shares of nonvoting, common stock of MMP, a corporation engaged in the business of selling automobile parts.

---

[3]All Rule references are to the Tax Court Rules of Practice and Procedure.  All section references are to the Internal Revenue Code in effect for the years at issue.

During the trial in the marriage dissolution action, Ms. Read and Mr. Read reached an oral settlement agreement (marital settlement agreement) which was read into the record in that action on December 5, 1985.  The marital settlement agreement provided in pertinent part:

> Wife [Ms. Read] agrees to convey to husband [Mr. Read] all of her stock in Mulberry Motor Parts, both voting and non-voting.  And for such stock, husband, or at his option, Mulberry Motor Parts or the Aesop [sic] plan of Mulberry Motor Parts agrees to purchase such stock at its appraised value of $838,724, such purchase to be closed within 60 days of this date and to be paid as follows:
>
> First, $200,000 down to be paid in cash * * * the balance of $638,724 to be evidenced by promissory note, to be signed by the purchaser but if the purchaser is other than William A. Read, to be guaranteed by William A. Read, and bearing interest at the rate of nine percent, payable monthly, on the principal, due from time to time; and with the principal to be payable $50,000 after twelve months and $50,000 principal each year thereafter until the principal is paid in full, with the right of prepayment at any time without pen-alty, and such purchase to be secured by a security interest in the stock to be sold, but with husband retaining a full right so long as he is in compliance and not in default on such note, to control such stock and to vote it.
>
>     *    *    *    *    *    *    *
>
> * * * Husband agrees to pay the wife as permanent periodic alimony the sum of $2,500 per month and con-tinuing until the death of the wife, the death of the husband, the remarriage of wife or wife's cohabitation with another man to whom she is not related by blood or marriage on a continuing basis for 60 days or more. * * *
>
>     *    *    *    *    *    *    *
>
> * * * Additionally provided, however, that such

alimony shall increase in amount from $2,500 per month to $3,000 per month at such time as the final principal payment is made by husband on the stock purchase called for on the Mulberry Motor Parts stock.

* * * * * * *

* * * The temporary alimony in the amount of $6,000 * * * the December payment of which has already been made, will terminate and no longer be payable in the event that husband pays the down payment on the stock purchase or causes it to be paid by either Mulberry Motor Parts or the Aesop [sic] plan and pays the consideration for the conveyance of the house and the $100,000 lump sum alimony on or before December 31st, 1985.

However, if husband fails to do so in whole or in part, the $6,000 temporary alimony will continue for the month of January, subject to termination only upon the death of the wife.

* * * * * * *

* * * Additionally, as part of the temporary support agreement, but for consideration in addition furnished by the wife, husband has agreed to maintain in force insurance on his life with death benefits payable to wife in the amount of $150,000, and continuing for a period of time that was ascertainable but uncertain.

Parties agree that so long as William A. Read owes to his wife any amount of principal on the stock purchase of Mulberry Motor Parts, he will maintain that insurance in force with her as beneficiary with [sic] the death benefits thereof, having the right to cancel such designation when the stock is paid in full.

In the event, however, of his death prior to payment of the stock purchase in full, the insurance proceeds will apply toward the balance then due and owing.

On December 30, 1985, the Florida court entered the divorce judgment dissolving the marriage.  The divorce judgment ordered

and adjudged in pertinent part that:

1.  The marriage of Husband, WILLIAM A. READ, and Wife, CAROL ELIZABETH READ, is hereby dissolved.

2.  The Marital Settlement Agreement dictated into the record before the Court on December 5, 1985, is ratified and approved by this Court and the parties are ordered to comply with all terms of that Agreement.

3.  Wife shall sell and convey to Husband, or at Husband's election to Mulberry Motor Parts, Inc., or the ESOP Plan of Mulberry Motor Parts, Inc., all of the outstanding stock which she holds in Mulberry Motor Parts, Inc., consisting of 1,200 shares of voting stock and 12,000 shares of non-voting stock by February 5, 1986. As consideration, Husband, or at his election Mulberry Motor Parts, Inc., or the ESOP Plan of Mulberry Motor Parts, Inc., shall pay to Wife simultaneously with the conveyance of such shares, the sum of $200,000. As additional consideration, Husband, or at his election Mulberry Motor Parts, Inc., or the ESOP Plan of Mulberry Motor Parts, Inc., shall deliver to Wife a promissory note in the principal amount of $638,724, which sum represents the balance of the purchase price to be paid for the stock. The note shall bear interest at the rate of 9%, which interest shall be payable monthly beginning one (1) month after the date of the note. The principal of the note shall be paid at the rate of $50,000 per year, the first payment shall be made twelve (12) months following the date of the note, and each year thereafter until the note is paid in full.

Husband or Mulberry Motor Parts, Inc., or the ESOP Plan of Mulberry Motor Parts, Inc., as the case may be, shall have right of prepayment without penalty. The note delivered to Wife shall be personally guaranteed by Husband.

The sale of the stock by Wife and the unpaid balance for the purchase of the stock by Husband shall be secured by a security interest in the stock to be sold for which payments has [sic] not been made, with Husband retaining the full right to vote said stock and control said stock so long as he is in compliance with the terms of this paragraph. The amount of the security interest shall reduce pro rata as principal pay-

ments are made.

* * * * * * *

8. Husband has been paying the sum of $6,000 per month as temporary alimony to Wife. Husband's obligation to pay temporary alimony shall terminate on the 1st of the month following the month in which Husband completes the payment on the down payment on the stock purchase plan in the amount of $200,000 and pays the lump sum alimony in the amount of $180,000. The permanent, periodic alimony as provided for in paragraph 9 shall begin the 1st of the month following the payment of such items. Husband's obligation to pay temporary alimony is subject to prior termination upon the death of Wife.

9. Husband shall pay to Wife as and for permanent, periodic alimony, the sum of $2,500 per month until the death of Wife, the death of Husband, Wife's remarriage or until Wife cohabits with a man to whom she is not related by blood or marriage on a continuing basis for at least sixty (60) days, whichever first occurs. On the 1st of the month following the final payment to Wife by Husband of the total consideration owed to her by reason of the transfer of her stock in Mulberry Motor Parts, Inc., such alimony shall increase to the sum of $3,000 per month. These provisions for permanent, periodic alimony provided in this paragraph of this Final Judgment shall not be subject to modification by either party, both parties have expressly waived all right to seek modification of the amounts and terms under which permanent, periodic alimony is payable.

* * * * * * *

11. Husband shall maintain on his life with Wife as beneficiary, life insurance having death benefits in the amount of $150,000. Husband's obligation to continue insurance for the benefit of Wife shall terminate upon the payment in full of the purchase price of the stock in Mulberry Motor Parts, Inc.

At some time on or after December 30, 1985, the date on which the divorce judgment was entered, and on or prior to

February 5, 1986, Mr. Read elected pursuant to the divorce judgment (1) that the sale and conveyance by Ms. Read of all of her MMP stock be made to MMP, instead of to Mr. Read, (2) that MMP, instead of Mr. Read, pay $200,000 to Ms. Read simultaneously with her sale and conveyance of such stock to MMP, and (3) that MMP, instead of Mr. Read, issue a promissory note to Ms. Read in the principal amount of $638,724 and bearing 9-percent interest.

On February 5, 1986, the board of directors of MMP, composed of Mr. Read, Ms. Read, and J.S. Huggart, Jr., executed a document entitled "ACTION BY WRITTEN CONSENT OF THE BOARD OF DIRECTORS OF MULBERRY MOTOR PARTS, INC." with respect to the foregoing election that Mr. Read made pursuant to the divorce judgment (MMP board action by written consent).[4]  The MMP board action by written consent stated in pertinent part:

> We, the undersigned, constituting all of the

---

[4]Under Florida law, any action which is required to be, or may be, taken at a meeting of the directors of a corporation may be taken without a meeting of such directors provided that a consent in writing setting forth the action to be taken is signed by all of the directors and is filed in the minutes of the proceedings of the board of directors.  Any such action by unanimous written consent of each director has the same effect as a unanimous vote of the board of directors.  See Fla. Stat. Ann. sec. 607.134 (West 1977) (current version at Fla. Stat. Ann. sec. 607.0821 (West 1993)).  By executing the document entitled "ACTION BY WRITTEN CONSENT OF THE BOARD OF DIRECTORS OF MULBERRY MOTOR PARTS, INC.", the three directors of MMP obviated the requirement under Florida law to hold a meeting at which such directors could adopt, by a majority vote, a resolution authorizing MMP, inter alia, to repurchase all of Ms. Read's MMP stock. See Fla. Stat. Ann. sec. 607.121 (West 1977) (current version at Fla. Stat. Ann. sec. 607.0824 (West 1993 & Supp. 1999)).

members of the Board of Directors of Mulberry Motor Parts, Inc., * * * do hereby take the following action by unanimous written consent, pursuant to the provisions of Section 607.134, Florida Statutes:

> RESOLVED, that it is advisable and in the best interest of the Corporation that the Corporation purchase 1,200 shares of its outstanding voting common capital stock and * * * 12,000 shares of its outstanding non-voting common capital stock from Carol E. Read for a purchase price of $838,724.00. The officers of the Corporation are hereby directed to repurchase such stock in accordance with the terms of the certain Stock Purchase Agreement dated February 5, 1986 * * *. The appropriate officers of the Corporation are hereby authorized and directed to execute and deliver on behalf of the Corporation such Agreement, the Installment Promissory Note and Stock Pledge Agreement (referred to in such Agreement) and any other documents necessary to consummate such transaction. The repurchased shares which are not subject to the Stock Pledge Agreement shall be retired on the books of the Corporation. As shares which are subject to the Stock Pledge Agreement are released, such shares shall be retired on the books of the Corporation.

On February 5, 1986, pursuant to Mr. Read's election under the divorce judgment, MMP and Ms. Read entered into the stock purchase agreement (stock purchase agreement) that was authorized in the MMP board action by written consent. That agreement provided in pertinent part:

> WHEREAS, Stockholder [Ms. Read] owns certain shares of the common capital stock of the Corporation [MMP];
>
> WHEREAS, Stockholder wishes to sell all of her common capital stock of the Corporation to the Corporation, which wishes to purchase such stock.

NOW, THEREFORE, the parties agree as follows:

1. Sales and Purchases of Stock. Simultaneously with the execution of this Agreement, Stockholder shall sell, and the Corporation shall redeem and purchase One Thousand Two Hundred (1,200) shares of voting stock of the Corporation and Twelve Thousand (12,000) shares of nonvoting common stock of the Corporation.

2. Purchase Price. The purchase price for the stock redeemed by the Corporation shall be Eight Hundred Thirty-Eight Thousand Seven Hundred Twenty-Four Dollars ($838,724.00), such price to be paid in the following manner:

(a) Down payment. The Corporation shall pay Two Hundred Thousand Dollars ($200,000.00) in cash upon delivery of the purchased stock by Stockholder.

(b) Installment Promissory Note. The Corporation shall deliver to Stockholder an Installment Promissory Note for Six Hundred Thirty-Eight Thousand Seven Hundred Twenty-Four Dollars ($638,724.00), (the "Note"), executed by the appropriate officers of the Corporation and individually guaranteed by William A. Read, upon delivery of the purchased stock by Stockholder. Such Note shall be in the form attached hereto as Exhibit A.

(c) Collateral Security. To secure the payment of the Note, 10,482 shares of the nonvoting common capital stock redeemed by the Corporation shall be pledged by assignment as collateral security to the Stockholder in accordance with a Stock Pledge Agreement to be executed by the Stockholder and the Corporation contemporaneously with the Note. Such Stock Pledge Agreement shall be in the form attached hereto as Exhibit B.

Pursuant to Mr. Read's election under the divorce judgment, on February 5, 1986, Ms. Read transferred to MMP her 1,200 shares of voting, and 12,000 shares of nonvoting, common stock of MMP

(Ms. Read's February 5, 1986 transfer of MMP stock); MMP paid Ms. Read $200,000 by check; and MMP issued to Ms. Read an installment promissory note in the amount of $638,724 and bearing 9-percent annual interest (installment promissory note).  That note provided in pertinent part:

> FOR VALUE RECEIVED, the undersigned [MMP] promises to pay to the order of CAROL E. READ the principal sum of Six Hundred Thirty-Eight Thousand Seven Hundred Twenty-Four and No/100ths Dollars ($638,724.00), together with interest thereon from February 5, 1986, at the rate of nine per cent (9%) per annum.  Interest on the unpaid principal balance shall be payable in equal monthly installments, commencing on March 5, 1986, and continuing on the fifth day of each month thereafter until the principal sum and interest have been fully paid.  Principal shall be payable in annual installments of Fifty Thousand and No/100ths Dollars ($50,000.00) each, commencing on February 5, 1987, and continuing on the fifth day of February of each year through 1998, with a final installment of Thirty-Eight Thousand Seven Hundred Twenty-Four and No/100ths Dollars ($38,724.00) due on February 5, 1999. * * *

> *   *   *   *   *   *   *

> The undersigned hereby waives presentment for payment, notice of nonpayment, protest and notice of protest of this note.

The installment promissory note was signed by William A. Read as president of MMP.  Immediately beneath that signature appeared the following guaranty by Mr. Read in his individual capacity, which he signed on February 5, 1986:

<u>INDIVIDUAL GUARANTY</u>

> The undersigned [Mr. Read] hereby individually unconditionally guarantees the payment of all sums due under this Installment Promissory Note.

The individual guaranty by Mr. Read of MMP's installment promissory note expressed in unambiguous terms an unconditional guaranty of Mr. Read. Consequently, under Florida law, that guaranty is what is known as an absolute guaranty, see Mullins v. Sunshine State Serv. Corp., 540 So. 2d 222, 223 (Fla. Dist. Ct. App. 1989); Anderson v. Trade Winds Enters. Corp., 241 So. 2d 174, 177 (Fla. Dist. Ct. App. 1970), and Mr. Read was secondarily liable on MMP's installment promissory note, see West Flagler Associates, Ltd. v. Dept. of Revenue for Fla., 633 So. 2d 555, 556-557 (Fla. Dist. Ct. App. 1994); Scott v. City of Tampa, 30 So. 2d 300, 302 (Fla. Dist. Ct. App. 1947).

The stock pledge agreement referred to in and attached to the stock purchase agreement was entered into on February 5, 1986 (stock pledge agreement). The stock pledge agreement provided in pertinent part:

> WHEREAS, Pledgor [MMP] is indebted to Pledgee [Ms. Read] in the amount of Six Hundred Thirty-Eight Thousand Seven Hundred Twenty-Four and NO/100th Dollars ($638,724.00) as evidenced by that certain promissory note from Pledgor to Pledgee dated February 5, 1986 [installment promissory note] * * * and

> WHEREAS, Pledgor owns 10,482 shares of its nonvoting common capital stock which it holds in its treasury and which it has purchased from Pledgee; and

> WHEREAS, Pledgor, as the owner of the above stock, agrees that it shall be pledged to Pledgee as security for the repayment of such indebtedness.

> NOW, THEREFORE, the parties agree as follows:

> 1. Pledge. Pledgor hereby grants to Pledgee a

security interest in 10,482 shares of its nonvoting common capital stock * * *. Pledgee shall hold the pledged shares as security for the repayment of the indebtedness described above and shall not encumber or dispose of such shares, except in accordance with the provisions of paragraph 7 of this Agreement.

2. <u>Term</u>. The shares pledged hereunder shall remain so pledged to Pledgee until released in accordance with the provisions of paragraph 3 of this Agreement.

3. <u>Release of Stock</u>.

(a) Upon each principal payment in the amount of Fifty Thousand and No/100th Dollars ($50,000.00) in accordance with the terms of * * * [installment promissory note], Pledgor shall be entitled to the release from this Stock Pledge Agreement of 820 shares of nonvoting common stock. Upon the demand at any time of Pledgor, Pledgee shall deliver to Pledgor the stock certificate for reissuance of such released shares, and Pledgor shall issue and deliver to Pledgee a new certificate representing the shares which remain subject to the pledge.

(b) Upon the repayment in full with interest of the indebtedness in accordance with the terms of * * * [installment promissory note], Pledgee shall transfer to Pledgor all of the remaining stock pledged hereunder.

* * * * * * *

7. <u>Default</u>. If Pledgor defaults in the performance of any of the terms of this Agreement or if Pledgor defaults in the payment of the indebtedness described in * * * [installment promissory note], then Pledgee shall have the following options exercisable at any time following thirty (30) days after any such default:

(a) Pledgee may declare the unpaid balance of the indebtedness immediately due and payable and then sell the pledged shares. * * *

* * * * * * *

Pledgee shall thereafter account to Pledgor
for any surplus proceeds, which shall be paid
over to Pledgor.  Pledgor shall remain liable
to Pledgee for any deficiency. * * *

(b)  Pledgee may declare the unpaid
balance of indebtedness immediately due and
payable and retain the pledged shares in
satisfaction of Pledgor's obligations under
* * * [installment promissory note] and under
this Agreement. * * *

(c)  Pledgee may declare the unpaid
balance of indebtedness immediately due and
payable and thereafter exercise all rights
and remedies afforded a secured party under
the provisions of the Uniform Commercial Code
in force in Florida as of the date of this
Agreement.

Since February 5, 1986, Mr. Read has owned 100 percent of
the outstanding voting common stock of MMP.  At the time of Ms.
Read's February 5, 1986 transfer of MMP stock and during the
years at issue, MMP's ESOP owned 4,961 shares of class B nonvot-
ing common stock of MMP.

MMP classified the installment promissory note as a liabil-
ity on its balance sheet for each of the years 1988, 1989, and
1990.  Pursuant to that note, MMP made the following payments of
principal and interest to Ms. Read during the years indicated:

|           | 1988     | 1989     | 1990     |
|-----------|----------|----------|----------|
| Principal | $50,000  | $50,000  | $50,000  |
| Interest  | 49,235   | 44,735   | 40,235   |

MMP deducted the interest payments that it made to Ms. Read
during each of the years 1988, 1989, and 1990 in its Federal

income tax (tax) return for each of those years.

Ms. Read did not report any income with respect to her transfer of MMP stock to MMP, except for the interest payments under the installment promissory note that MMP made to her during 1988, 1989, and 1990. She reported those interest payments as interest income in her tax returns for those years.

Mr. Read did not report in his tax returns for 1988, 1989, and 1990 any income with respect to Ms. Read's February 5, 1986 transfer of MMP stock.

Respondent determined in the notice issued to Ms. Read for 1989 and 1990[5] that the principal payment under the installment promissory note that MMP made to her during each of those years constitutes long-term capital gain.[6] Respondent made no determinations in that notice with respect to the interest payments under the installment promissory note that Ms. Read reported as interest income in her returns for those years.

Respondent determined in the notice issued to Mr. Read for 1988, 1989, and 1990 that the principal and interest payments under the installment promissory note that MMP made to Ms. Read during those years are constructive dividends to Mr. Read.

Respondent determined in the notice issued to MMP for 1988,

---

[5]The notice issued to Ms. Read did not relate to Ms. Read's taxable year 1988.

[6]The parties stipulated that Ms. Read's basis in the MMP stock that she owned was zero.

1989, and 1990 that the interest payments under the installment promissory note that it made to Ms. Read during those years are not deductible.

The underlying common issue presented in the cross-motions for partial summary judgment is whether section 1041 applies to the transfer by Ms. Read to MMP of her stock in that company.  It is Ms. Read's position that section 1041 applies to that transfer, while Mr. Read and MMP take the position that it does not.[7] Respondent's role here is that of a stakeholder.  Nonetheless, respondent has indicated that "Ms. Read has the better argument that she should not recognize any gain from the sale of her stock pursuant to I.R.C. § 1041."

Section 1041 provides in pertinent part:

SEC. 1041.  TRANSFERS OF PROPERTY BETWEEN SPOUSES OR INCIDENT TO DIVORCE.

(a) General Rule.--No gain or loss shall be recognized on a transfer of property from an individual to (or in trust for the benefit of)--

(1) a spouse, or

(2) a former spouse, but only if the transfer is incident to the divorce.

(b) Transfer Treated as Gift; Transferee Has Transferor's Basis.--In the case of any transfer of property described in subsection (a)--

---

[7] Mr. Read and MMP indicated in their motion that if the Court were to hold that sec. 1041 applies to Ms. Read's transfer of her MMP stock to MMP, the determinations in the respective notices issued to Mr. Read and to MMP should be sustained.

(1) for purposes of this subtitle, the property shall be treated as acquired by the transferee by gift, and

(2) the basis of the transferee in the property shall be the adjusted basis of the transferor.

(c) Incident to Divorce.--For purposes of subsection (a)(2), a transfer of property is incident to the divorce if such transfer--

(1) occurs within 1 year after the date on which the marriage ceases, or

(2) is related to the cessation of the marriage.

Temporary, but not final, regulations have been issued under section 1041. Those temporary regulations provide that the transferor of property under section 1041 is to recognize no gain or loss on the transfer, regardless of whether the transfer is in exchange for consideration. See sec. 1.1041-1T(c), Q&A-10, Temporary Income Tax Regs., 49 Fed. Reg. 34453 (Aug. 31, 1984). The temporary regulations under section 1041 further provide that in all transfers subject to that section the basis of the transferred property in the hands of the transferee is the adjusted basis of such property in the hands of the transferor immediately before the transfer, regardless of whether the transfer is a bona fide sale in which the transferee pays the transferor consideration for the transferred property. See sec. 1.1041-1T(c), Q&A-11, Temporary Income Tax Regs., 49 Fed. Reg. 34453 (Aug. 31, 1984).

- 19 -

The temporary regulations under section 1041 also describe
the circumstances in which a transfer of property by a spouse to
a third party on behalf of a spouse or former spouse qualifies as
a transfer to which section 1041 applies.  See sec. 1.1041-1T(c),
Q&A-9, Temporary Income Tax Regs. (Q&A-9), 49 Fed. Reg. 34453
(Aug. 31, 1984).  Q&A-9 provides in pertinent part:

> Q-9.  May transfers of property to third parties
> on behalf of a spouse (or former spouse) qualify under
> section 1041?
>
> A-9.  Yes.  There are three situations in which a
> transfer of property to a third party on behalf of a
> spouse (or former spouse) will qualify under section
> 1041, provided all other requirements of the section
> are satisfied.  The first situation is where the trans-
> fer to the third party is required by a divorce or
> separation instrument.  The second situation is where
> the transfer to the third party is pursuant to the
> written request of the other spouse (or former spouse).
> The third situation is where the transferor receives
> from the other spouse (or former spouse) a written
> consent or ratification of the transfer to the third
> party. * * * In the three situations described above,
> the transfer of property will be treated as made di-
> rectly to the nontransferring spouse (or former spouse)
> and the nontransferring spouse will be treated as
> immediately transferring the property to the third
> party.  The deemed transfer from the nontransferring
> spouse (or former spouse) to the third party is not a
> transaction that qualifies for nonrecognition of gain
> under section 1041.

Ms. Read contends that her transfer of MMP stock to MMP was
a transfer of property by her to a third party on behalf of Mr.
Read within the meaning of Q&A-9 and that that transfer fits
within both the first situation and the second situation de-
scribed in that temporary regulation.  Consequently, according to

Ms. Read, section 1041(a) prescribes nonrecognition treatment to her with respect to her transfer of MMP stock to MMP. Mr. Read and MMP counter that Ms. Read's February 5, 1986 transfer of MMP stock was not a transfer of property to a third party on behalf of Mr. Read within the meaning of Q&A-9 and that that transfer does not fit within either of the first two situations (or the third situation) described in that temporary regulation. Consequently, according to Mr. Read and MMP, section 1041(a) does not provide nonrecognition treatment to Ms. Read with respect to Ms. Read's February 5, 1986 transfer of MMP stock.

In advancing their respective positions, Ms. Read and Mr. Read and MMP argue that Hayes v. Commissioner, 101 T.C. 593 (1993), Arnes v. Commissioner, 102 T.C. 522 (1994), and Blatt v. Commissioner, 102 T.C. 77 (1994), prescribe the legal standard that we must apply in order to determine whether Ms. Read's transfer of her MMP stock to MMP constitutes a transfer of property by a spouse (the transferring spouse, here Ms. Read) to a third party (here MMP) on behalf of a spouse[8] (the nontransferring spouse, here Mr. Read) within the meaning of Q&A-9 (on-behalf-of standard). According to petitioners, those cases establish that the on-behalf-of standard may be satisfied in the instant cases only if Mr. Read had a primary and unconditional

---

[8]For convenience, we shall refer only to a spouse, and not to a former spouse.

obligation to purchase Ms. Read's MMP stock, such that under established principles of tax law (constructive-dividend decisional law), see, e.g., <u>Sullivan v. United States</u>, 363 F.2d 724, 728-729 (8th Cir. 1966); <u>Smith v. Commissioner</u>, 70 T.C. 651, 668 (1978), Mr. Read received a constructive dividend (to the extent of MMP's earnings and profits) as a result of MMP's payment to Ms. Read of the consideration stated in the divorce judgment in redemption of her stock (primary-and-unconditional-obligation standard).

We disagree with petitioners that <u>Hayes v. Commissioner</u>, <u>supra</u>, <u>Arnes v. Commissioner</u>, <u>supra</u>, and <u>Blatt v. Commissioner</u>, <u>supra</u>, require us to apply the primary-and-unconditional-obligation standard as to Mr. Read in order to determine whether the on-behalf-of standard in Q&A-9 is satisfied in the instant cases. As respondent correctly points out, this Court has not expressed an opinion on whether the on-behalf-of standard in Q&A-9 is the same as the primary-and-unconditional-obligation standard in constructive-dividend decisional law. See <u>Arnes v. Commissioner</u>, <u>supra</u> at 529 n.3, which this Court decided after it decided <u>Hayes v. Commissioner</u>, <u>supra</u>, and <u>Blatt v. Commissioner</u>, <u>supra</u>. We find petitioners' reliance on those three cases to support their view that in the instant cases the on-behalf-of standard in Q&A-9 is the same as the primary-and-unconditional-obligation standard in constructive-dividend decisional law to be misplaced.

The only issue that we decided in Hayes v. Commissioner, supra, was whether the redemption by JRE, Inc. (JRE), a corporation owned by the taxpayer Ms. Hayes and the taxpayer Mr. Hayes who was her former spouse,[9] of Ms. Hayes' JRE stock resulted in a constructive dividend to Mr. Hayes. The role of the Commissioner of Internal Revenue (Commissioner) in Hayes, like respondent's role in the instant cases, was that of a stakeholder. Nonetheless, the Commissioner argued in Hayes v. Commissioner, supra, that the tax incurred as a result of the redemption of Ms. Hayes' JRE stock should be borne by Mr. Hayes. That was because, according to the Commissioner, JRE's redemption of Ms. Hayes' stock constituted a constructive dividend to Mr. Hayes since at the time of that redemption he had a primary and unconditional obligation to buy that stock from her. See id. at 597. On the facts presented, we held that Mr. Hayes received a constructive dividend as a result of that redemption because when JRE redeemed Ms. Hayes' JRE stock it satisfied Mr. Hayes' primary and unconditional obligation to purchase that stock from Ms. Hayes. See id. at 605. Having so held, we stated:

> Respondent has indicated to the Court that, if we find that Mr. Hayes received a constructive dividend in connection with JRE's undertaking to redeem Ms. Hayes' stock, as we have done, she will concede that section 1041 shields Ms. Hayes from recognition of gain on the amount realized from the exchange of her stock. Ac-

_____

[9]We had consolidated the cases of Ms. Hayes and Mr. Hayes for trial, briefing, and opinion.

> cordingly, under respondent's concession, our resolu-
> tion of the constructive dividend issue in Mr. Hayes'
> case renders the section 1041 issue in Ms. Hayes' case
> moot. [Id. at 606; emphasis added.]

We did not decide any issue in Hayes under Q&A-9 and section
1041.[10]

Similarly, the only issue that we decided in Arnes v.
Commissioner, supra, was whether the redemption by a corporation
known as Moriah, which was owned equally by the taxpayer Mr.
Arnes who was before us and his former spouse Ms. Arnes who was
not before us,[11] of Ms. Arnes' Moriah stock resulted in a con-
structive dividend to Mr. Arnes. See Arnes v. Commissioner,
supra at 527. The Commissioner's position in Arnes was that at
the time of that redemption Mr. Arnes had a primary and uncondi-
tional obligation to buy Ms. Arnes' Moriah stock. Therefore,
according to the Commissioner, he received a constructive divi-
dend as a result of Moriah's redemption of that stock. In
support of that position, the Commissioner argued that, under
Golsen v. Commissioner, 54 T.C. 742 (1970), affd. 445 F.2d 985
(10th Cir. 1971), the conclusion of the U.S. Court of Appeals for
the Ninth Circuit in Arnes v. United States, 981 F.2d 456, 459

---

[10]Any suggestion in Hayes v. Commissioner, 101 T.C. 593
(1993), that the Commissioner's concession under sec. 1041 as to
Ms. Hayes is confirmed by Q&A-9 is dictum.

[11]Ms. Arnes was the taxpayer before the U.S. Court of Ap-
peals for the Ninth Circuit in Arnes v. United States, 981 F.2d
456 (9th Cir. 1992), discussed below.

(9th Cir. 1992), that the obligation to purchase Ms. Arnes' stock was Mr. Arnes' obligation, and not the obligation of Moriah, controlled our decision in Arnes v. Commissioner, 102 T.C. 522 (1994). The Commissioner did not ask us in Arnes v. Commissioner, supra, to determine whether the on-behalf-of standard in Q&A-9 was met as a result of the transfer by Ms. Arnes, who was not a party before us in that case, of her Moriah stock to that company. With respect to the Commissioner's reliance on Golsen, we held in Arnes v. Commissioner, supra at 529:

> Golsen v. Commissioner, supra, does not apply because Arnes v. United States, supra, does not address the legal issue here: whether there is a constructive dividend to petitioner [Mr. Arnes]. That case concerned the tax consequences to Joann [Ms. Arnes] under section 1041. * * * We note that petitioner was not a party in Arnes [v. United States, supra], and Joann had a possibly[3] adverse position to petitioner in that case.[12]

On the facts presented, we found that Mr. Arnes did not have a primary and unconditional obligation[13] to buy Ms. Arnes' Moriah

---

[12]We stated in footnote 3 referred to in the foregoing excerpt from Arnes v. Commissioner, 102 T.C. 522, 529 n.3 (1994):

> This majority opinion does not express an opinion as to whether the standard of "on behalf of" the spouse in sec. 1.1041-1T(c), Q&A-9, Temporary Income Tax Regs. * * * is the same as the primary and unconditional obligation rule applicable to a constructive dividend. Suffice it to say that our conclusion in this case [Arnes v. Commissioner, supra] is consistent with our conclusion in Blatt v. Commissioner, 102 T.C. 77 (1994), also a Court-reviewed opinion.

[13]Unlike the divorce judgment involved in the instant cases,
(continued...)

stock at the time Moriah redeemed it. Consequently, we held that Mr. Arnes did not receive a constructive dividend as a result of that redemption. See id. at 528-529. We did not decide any issue in Arnes under Q&A-9 and section 1041.

The only reported opinion of this Court in which we decided whether a transfer of property by a transferring spouse to a third party was on behalf of the nontransferring spouse within the meaning of Q&A-9 is Blatt v. Commissioner, 102 T.C. 77 (1994). In Blatt, the taxpayer Ms. Blatt and her husband Mr. Blatt each owned 50 percent of the stock of a corporation known as Phyllograph. See id. at 78. Unlike the divorce judgment involved in the instant cases, but like the divorce decree involved in Arnes v. Commissioner, supra, the divorce decree in Blatt provided in pertinent part:

> IT IS FURTHER ORDERED and ADJUDGED that the parties,
> being equal stockholders, shall cause Phyllograph Corp.
> to redeem plaintiff's [Ms. Blatt's] stock in said
> Corporation * * * for the sum of Forty-five Thousand
> Three Hundred Eighty-four Dollars * * *. [Id. n.4.]

Pursuant to that divorce decree, Phyllograph redeemed all of Ms. Blatt's Phyllograph stock in exchange for cash. See id. at 78. Ms. Blatt did not report any of the proceeds that she received from Phyllograph in redemption of her stock. The Commissioner

---

[13](...continued)
the divorce decree in Arnes v. Commissioner, supra, provided that Ms. Arnes and Mr. Arnes were to cause Moriah to redeem from Ms. Arnes her Moriah stock. See id. at 524.

determined that Ms. Blatt realized and must recognize long-term capital gain as a result of that redemption. See id. Ms. Blatt took the position in Blatt v. Commissioner, supra, that the redemption of her stock by Phyllograph qualified as a transfer of property to a third party on behalf of Mr. Blatt under Q&A-9 that is not taxable to her under section 1041(a). See id. at 80. In support of her position, Ms. Blatt relied principally on Arnes v. United States, supra.[14] We rejected Ms. Blatt's position and

---

[14]The issue in Arnes v. United States, supra, was whether the redemption of Ms. Arnes' Moriah stock pursuant to the divorce decree involved there constituted a transfer of property by Ms. Arnes, the taxpayer before the Court of Appeals for the Ninth Circuit in that case, to a third party on behalf of Mr. Arnes within the meaning of Q&A-9. The Court of Appeals for the Ninth Circuit, the court to which an appeal in Ms. Read's case would normally lie, noted, inter alia, that "Generally, a transfer is considered to have been made 'on behalf of' someone if it satisfied an obligation or a liability of that person." Id. at 459. On the facts presented, that court held that the transfer by Ms. Arnes of her Moriah stock to Moriah "did relieve John [Mr. Arnes] of an obligation", id., and that that transfer constituted a transfer to a third party on behalf of Mr. Arnes under Q&A-9, see id.

In Ingham v. United States, 167 F.3d 1240 (9th Cir. 1999), the Court of Appeals for the Ninth Circuit revisited the meaning of the phrase "transfer of property to a third party on behalf of a spouse" in Q&A-9. In Ingham, the Court of Appeals rejected the taxpayer's expansive definition of that phrase, which included "all transfers of property that result in a substantial benefit, in any form, to the nontransferring or former spouse", because it found such a definition to be inconsistent with Arnes v. United States, supra. According to the Court of Appeals in Ingham v. United States, supra at 1244:

The focus of the court's analysis in Arnes [v. United States, supra] was not whether the plaintiff's [transferring spouse's] former husband had received some general benefit as a result of the plaintiff's transac-

(continued...)

indicated that we disagreed with Arnes v. United States, supra.[15]
See id. at 82-83.

In Blatt v. Commissioner, supra at 81, we addressed the
meaning of the phrase "on behalf of" in Q&A-9. We stated that
"The term 'on behalf of' means 'in the interest of' or 'as a
representative of', Webster's Ninth New Collegiate Dictionary
(1990)". Id. We found that Ms. Blatt did not claim, see id.
n.12, and that "the record does not indicate that petitioner [Ms.
Blatt] was acting in the interest of [Mr.] Blatt or as a repre-
sentative of [Mr.] Blatt at the time of the redemption." Id. We
also indicated in Blatt that "A transfer that satisfies an
obligation or a liability of someone is a transfer on behalf of

---

[14](...continued)
tion, but rather whether the transaction had satisfied
some legal obligation or liability owed by her former
husband. * * *

The Court of Appeals held in Ingham v. United States, supra,
that, because the taxpayer's sale in question to a third party
did not satisfy any such obligation or liability of the tax-
payer's former spouse, the taxpayer was not entitled to
nonrecognition treatment with respect to that sale under sec.
1041. See id. at 1245.

[15]We stated in Blatt v. Commissioner, 102 T.C. 77, 83
(1994):

we disagree with Arnes; any putative benefit to Blatt,
such as relief from a possible claim under marital
property distribution laws, does not mean that the
transfer by petitioner of her shares to [Phyllograph]
corporation was on behalf of Blatt. We note, however,
that the facts in Arnes are easily distinguishable from
the facts at hand. * * *

that person".  Id.  We found that "petitioner [Ms. Blatt] does not claim, and the record does not indicate, that the redemption satisfied any obligation of [Mr.] Blatt."  Id. at 81-82.  We further concluded that Ms. Blatt did not otherwise show that she was acting on behalf of Mr. Blatt.  See id. n.12.  We found that Ms. Blatt failed to show error in respondent's determination to treat the redemption involved there as a taxable event to her. We held:

> the record in the instant case is devoid of evidence
> disproving respondent's determination that petitioner's
> [Ms. Blatt's] transfer of her stock to corporation
> [Phyllograph] was not on behalf of [Mr.] Blatt within
> the meaning of Q&A 9.  The redemption, in form, was a
> transaction between petitioner and corporation; she
> transferred her stock to corporation in exchange for
> its appreciated value in cash. * * *  [Id. at 81.]

We did not decide in Blatt v. Commissioner, supra, that only if the primary-and-unconditional-obligation standard is satisfied as to the nontransferring spouse may a transfer by the transferring spouse to a corporation of such transferring spouse's stock in that corporation be considered to be a transfer of property by a spouse to a third party on behalf of the nontransferring spouse within the meaning of Q&A-9.[16]  Moreover, the illustration that

---

[16]Nor did we indicate in Blatt v. Commissioner, supra, that the common, ordinary meaning (i.e., the dictionary definition) of the phrase "on behalf of" which we cited with approval and on which we relied in that case is to be applied for purposes of Q&A-9 only to factual contexts that were not even involved in Blatt, i.e., to factual contexts other than corporate redemptions.  In addition, we did not indicate in Blatt that the

(continued...)

we gave in <u>Blatt</u> of a transfer of property by a spouse to a third party that satisfies an obligation or a liability of the other spouse, which we indicated in <u>Blatt</u> is one type of transfer by a transferring spouse that constitutes a transfer of property to a third party on behalf of a nontransferring spouse within the meaning of Q&A-9, did not implicate the primary-and-unconditional-obligation standard.[17]  If, as petitioners contend here, we had concluded in <u>Blatt v. Commissioner</u>, 102 T.C. 77 (1994), a case which, like the instant cases, involved a corporate redemption in a divorce setting, that satisfaction of the primary-and-unconditional-obligation standard as to the nontransferring spouse is the only way in which the on-behalf-of standard in Q&A-9 may be met in the case of such a redemption, we

---

[16](...continued)
additional meaning of the phrase "a transfer [of property] on behalf of" someone which we cited with approval and on which we relied in that case, i.e., "A transfer [of property] that satisfies an obligation or a liability of someone", is the only meaning that can be attributed to the on-behalf-of standard in Q&A-9 in the context of corporate redemptions.

[17]Instead, we gave the following illustration:

To illustrate the operation of Q&A 9, assume that H owes a debt to a bank, and W, as part of a divorce settlement, transfers her unencumbered appreciated stock to the bank in discharge of H's debt.  This transfer falls within the first "situation" described in Q&A 9; that is, the transfer is required by a divorce instrument and is made by W on behalf of H. * * * [<u>Blatt v. Commissioner</u>, <u>supra</u> at 81.]

would have expressly so stated.  We did not.[18]

We have rejected petitioners' reliance on Hayes v. Commis-
sioner, 101 T.C. 593 (1993), Arnes v. Commissioner, 102 T.C. 522
(1994), and Blatt v. Commissioner, supra, to support their view
that in the instant cases the on-behalf-of standard in Q&A-9 is
the same as the primary-and-unconditional-obligation standard in
constructive-dividend decisional law.  We shall now decide
whether Ms. Read's February 5, 1986 transfer of MMP stock will
satisfy the on-behalf-of standard in Q&A-9 only if, as petition-
ers argue, the primary-and-unconditional-obligation standard is
satisfied as to Mr. Read.  We hold that the primary-and-
unconditional-obligation standard is not an appropriate standard

---

[18]Nor did we conclude in Blatt v. Commissioner, supra, as
has been suggested, that Q&A-9 may never apply to a corporate
redemption in a divorce setting.  To the contrary, as discussed
above, we concluded in Blatt that Ms. Blatt could have estab-
lished that she made a transfer of property to a third party on
behalf of Mr. Blatt within the meaning of Q&A-9 if she had shown
that at the time she transferred to Phyllograph her stock in that
company (1) she was acting in the interest of Mr. Blatt, (2) she
was acting as his representative, or (3) the transfer of her
Phyllograph stock to that corporation satisfied an obligation or
a liability of Mr. Blatt.  See id. at 82 & n.12.  If we had
concluded in Blatt that, as a matter of law, Q&A-9 and sec. 1041
may never apply to a corporate redemption in a divorce setting,
we would have expressly so stated.  We did not.
    The Court of Appeals for the Ninth Circuit in Arnes v.
United States, 981 F.2d 456 (9th Cir. 1992), held that Q&A-9 and
sec. 1041 applied in the case of a corporate redemption in a
divorce setting.  Although in Blatt we expressed our disagreement
with the holding in Arnes v. United States, supra, our disagree-
ment with that holding was not based upon our conclusion that, as
a matter of law, Q&A-9 and sec. 1041 may never apply in the case
of a corporate redemption in a divorce setting.  See Blatt v.
Commissioner, supra.

to apply in the instant cases in order to determine whether Ms. Read's transfer of her MMP stock to MMP was a transfer of property by the transferring spouse (Ms. Read) to a third party (MMP) on behalf of the nontransferring spouse (Mr. Read) within the meaning of Q&A-9.[19]  We further hold that the primary-and-unconditional-obligation standard is not an appropriate standard to apply in any case involving a corporate redemption in a divorce setting in order to determine whether the transfer of property by the transferring spouse to a third party is on behalf of the nontransferring spouse within the meaning of Q&A-9.[20]

---

[19]Consequently, we need not resolve the parties' dispute over whether the primary-and-unconditional-obligation standard is satisfied as to Mr. Read.

[20]Our holdings that the primary-and-unconditional-obligation standard is not an appropriate standard to apply under Q&A-9 in the instant cases, or in any case involving a corporate redemption in a divorce setting, do not disturb constructive-dividend decisional law.  That law applies the primary-and-unconditional-obligation standard in order to determine in the case of a corporate redemption the tax consequences to a stockholder whose stock is <u>not</u> being redeemed and who is analogous to the nontransferring spouse under Q&A-9 and sec. 1041 in the case of a corporate redemption in a divorce setting.  Constructive-dividend decisional law does not apply the primary-and-unconditional-obligation standard to determine the tax consequences to the stockholder whose stock <u>is</u> being redeemed and who is analogous to the transferring spouse under Q&A-9 and sec. 1041 in the case of a corporate redemption in a divorce setting.  In contrast, sec. 1041 prescribes the tax consequences to the transferring spouse of a transfer of property by that spouse to the nontransferring spouse.  Q&A-9 addresses a transfer of property by the transferring spouse to a third party on behalf of the nontransferring spouse.  In the case of such a transfer, Q&A-9 and sec. 1041 provide nonrecognition treatment to the transferring spouse whose stock is being redeemed (provided that the other requirements of

(continued...)

In arguing that only satisfaction of the primary-and-unconditional-obligation standard as to Mr. Read may satisfy the on-behalf-of standard in Q&A-9, petitioners seem to be suggesting that that temporary regulation requires only that there be a transfer of property on behalf of the nontransferring spouse (here Mr. Read), regardless who is making the transfer of property and to whom such property is transferred. Petitioners thus reverse the on-behalf-of standard in Q&A-9 to read as follows: A transfer of property <u>by a third party to the transferring spouse</u> on behalf of the nontransferring spouse.[21] However, Q&A-9 does not read that way and does not address such a transfer. Q&A-9

_____

[20](...continued)
Q&A-9 and sec. 1041 are satisfied). In the case of a corporate redemption in a divorce setting, Q&A-9 and sec. 1041 do not address the tax consequences to the nontransferring spouse whose stock is <u>not</u> being redeemed, although Q&A-9 makes it clear that if that temporary regulation applies, the nontransferring spouse is deemed to have immediately transferred to a third party, in a transaction that does not qualify for nonrecognition treatment under sec. 1041, the property that such spouse is deemed to have received from the transferring spouse. However, neither Q&A-9 nor sec. 1041 prescribes the tax consequences to the nontransferring spouse as a result of that deemed transfer. Instead, that tax treatment is determined by other provisions of the Internal Revenue Code.

[21]The inquiry under constructive-dividend decisional law as to whether a transfer of redemption proceeds by the redeeming corporation to the redeeming stockholder satisfies a primary and unconditional obligation of another stockholder is intended to determine whether such a transfer, in substance, is (1) a payment by the redeeming corporation of a dividend to the stockholder whose stock is not being redeemed in an amount equal to such redemption proceeds and (2) an immediate transfer of that same amount by such stockholder to the stockholder whose stock is being redeemed in payment for such stock.

addresses and requires a transfer of property <u>by a transferring</u> <u>spouse to a third party</u> on behalf of the nontransferring spouse.[22]

The primary-and-unconditional-obligation standard does not require analysis of (or even address) the transfer that Q&A-9 requires be analyzed in order to determine whether that temporary regulation applies (provided that the other requirements of Q&A-9 and section 1041 are satisfied). The transfer that must be analyzed under constructive-dividend decisional law in order to determine whether the primary-and-unconditional-obligation standard is satisfied and whether a stockholder whose stock <u>is</u> <u>not</u> <u>being</u> <u>redeemed</u> received a constructive dividend is the transfer by the redeeming corporation of the redemption proceeds to the stockholder whose stock is being redeemed.[23] In contrast,

---

[22]The inquiry under Q&A-9 as to whether a transfer of property by the transferring spouse to a third party is made on behalf of the nontransferring spouse is intended to determine whether such a transfer, in substance, is (1) a transfer by the transferring spouse of property to the nontransferring spouse and (2) an immediate transfer of that property by the nontransferring spouse to the third party.

[23]It has been suggested that the primary-and-unconditional-obligation standard should be adopted as the only standard for determining whether the on-behalf-of standard in Q&A-9 is satisfied in the case of a corporate redemption in a divorce setting because the primary-and-unconditional-obligation standard has served well in distinguishing between the form and substance of corporate redemptions occurring in commercial settings. If that suggestion is intended to mean that adoption of the primary-and-unconditional-obligation standard by the courts has eliminated, or substantially minimized, litigation over whether a stockholder
(continued...)

the transfer that must be analyzed under Q&A-9 in the present cases (and in any case involving a corporate redemption in a divorce setting) in order to determine whether the on-behalf-of standard in Q&A-9 is satisfied and whether the stockholder whose stock is being redeemed (here Ms. Read, the transferring spouse) is not required to recognize gain or loss under section 1041 is the transfer by that transferring spouse of the stock being redeemed (property) to the redeeming corporation (here MMP, a third party).  Only if that transfer is made on behalf of the spouse whose stock is not being redeemed (here Mr. Read, the nontransferring spouse) does the transfer of property (here MMP stock) by the transferring spouse (here Ms. Read) to a third party (here MMP) satisfy the on-behalf-of standard in Q&A-9.

The judicially created primary-and-unconditional-obligation standard is well established in the tax law.  If in issuing Q&A-9 the Treasury Department had intended that in the case of, and solely in the case of, a corporate redemption in a divorce setting the on-behalf-of standard may be satisfied only by

[23](...continued)
whose stock is not being redeemed receives a constructive divi-
dend as a result of the redemption of the stock of another
stockholder, we disagree with that suggestion.  The determination
of whether the primary-and-unconditional-obligation standard has
been satisfied is a fact-intensive inquiry, which has engendered
much litigation in which the parties have disputed whether that
standard is met as to the stockholder whose stock is not being
redeemed.  Indeed, in the instant cases, the parties disagree
over whether that standard is met as to Mr. Read.

satisfaction of the primary-and-unconditional-obligation stan-
dard, the Treasury Department would have expressly so indicated
in Q&A-9.  It did not.

We have rejected petitioners' argument in these cases that
only if the primary-and-unconditional-obligation standard is met
as to Mr. Read may the on-behalf-of standard in Q&A-9 be satis-
fied.  We shall now determine whether Ms. Read's transfer of her
MMP stock to MMP was a transfer of property by the transferring
spouse (Ms. Read) to a third party (MMP) on behalf of the
nontransferring spouse (Mr. Read) within the meaning of Q&A-9.
We shall make that determination by applying the meanings of the
phrase "on behalf of" in Q&A-9 which we cited with approval and
on which we relied in Blatt v. Commissioner, 102 T.C. at 82.

We shall turn first to whether Ms. Read's transfer of her
MMP stock to MMP satisfied a liability or an obligation of Mr.
Read, one of the ways in which we indicated in Blatt v. Commis-
sioner, supra, a transfer of property would be considered a
transfer of property by the transferring spouse to a third party
on behalf of the nontransferring spouse within the meaning of
Q&A-9.  We find that it did not.  Under the divorce judgment, Mr.
Read's obligation[24] to purchase Ms. Read's MMP stock for the

_____

[24]In support of their position that Ms. Read's transfer of
her MMP stock to MMP does not satisfy the on-behalf-of standard
in Q&A-9, Mr. Read and MMP contend, inter alia, that "Mr. Read
would not be obligated [under the divorce judgment] to purchase
(continued...)

consideration stated in that judgment was <u>owed</u> <u>to</u> <u>Ms</u>. <u>Read</u>.  Ms. Read's transfer of her MMP stock to MMP (i.e., the transferring spouse's transfer of property to a third party) did not satisfy that obligation of Mr. Read to Ms. Read.

We shall now determine whether under the common, ordinary meaning of the phrase "on behalf of" which we cited with approval and on which we relied in <u>Blatt v. Commissioner</u>, <u>supra</u> at 81, Ms. Read's transfer of her MMP stock to MMP was a transfer of property by the transferring spouse to a third party on behalf of the nontransferring spouse within the meaning of Q&A-9.  We indicated in <u>Blatt</u> that the common, ordinary meaning of the phrase "on behalf of" in Q&A-9 is "in the interest of" or "as a representative of".  See <u>id.</u> at 81 (quoting Webster's Ninth New Collegiate Dictionary (1990)).  Applying that meaning to the facts in the instant cases,[25] we find that Ms. Read was acting as Mr. Read's

---

[24](...continued)
Ms. Read's [MMP] stock unless he affirmatively elected to purchase the stock".  We find that contention of Mr. Read and MMP to be contrary to the plain language of the divorce judgment and a strained and unreasonable construction thereof.  The divorce judgment obligated Ms. Read to transfer to Mr. Read, and Mr. Read to purchase from Ms. Read, her MMP stock.  No condition had to be satisfied under that judgment in order for those obligations to exist.  The divorce judgment did permit Mr. Read to elect to have Ms. Read transfer her MMP stock to MMP or to MMP's ESOP, instead of to him, and to have MMP or MMP's ESOP, instead of him, purchase that stock from her.  Mr. Read decided to, and did, make that election.

[25]During the trial in the marriage dissolution action that Ms. Read instituted against Mr. Read, Ms. Read and Mr. Read
(continued...)

representative in transferring her MMP stock to MMP, and that Ms.

Read was acting in the interest of Mr. Read in making that

transfer to MMP,[26] in that she was following and implementing Mr.

_____

[25](...continued)
reached an oral agreement referred to herein as the marital settlement agreement.  The Florida court ratified and approved that agreement in the divorce judgment and ordered Ms. Read and Mr. Read to comply with the terms of that agreement.  The marital settlement agreement provided in pertinent part:

> Wife [Ms. Read] agrees to convey to husband [Mr. Read] all of her stock in Mulberry Motor Parts, both voting and non-voting.  And for such stock, husband, or at his option, Mulberry Motor Parts or the Aesop [sic] plan of Mulberry Motor Parts agrees to purchase such stock at its appraised value * * *.

Thus, the marital settlement agreement required (1) Ms. Read to transfer her MMP stock to Mr. Read and (2) Mr. Read to pay Ms. Read a specified amount of consideration for that stock.  That agreement also gave Mr. Read, and only Mr. Read, the option of deciding that MMP or MMP's ESOP, instead of him, pay that consideration to Ms. Read.

[26]It has been suggested that Ms. Read's transfer of her MMP stock to MMP was in the interest of Ms. Read, and not in the interest of Mr. Read, in that Ms. Read wanted or preferred to have MMP, rather than Mr. Read, purchase her stock because in that event she would have received from MMP cash and MMP's note that was guaranteed by Mr. Read, rather than merely cash and a note from Mr. Read.  Such a suggestion assumes that the financial condition of MMP was better than the financial condition of Mr. Read at the time of Ms. Read's February 5, 1986 transfer of MMP stock and that Ms. Read wanted or preferred to have MMP, rather than Mr. Read, purchase her MMP stock.  The record does not support either of those assumptions.  In fact, we infer from the record that Mr. Read's financial condition at the time of Ms. Read's February 5, 1986 transfer of MMP stock was better than the financial condition of MMP.  That is because under the divorce judgment the note that Mr. Read was obligated to transfer to Ms. Read (along with a stated amount of cash) in order to pay her for her MMP stock was not required to be guaranteed by MMP.  We also infer from the record that Ms. Read did not want or prefer that

(continued...)

Read's direction as reflected in his election under the divorce judgment that she transfer her MMP stock to MMP.  Absent Mr. Read's election, Ms. Read was obligated under that judgment to transfer that stock to Mr. Read.  We hold that Ms. Read's transfer to MMP of her MMP stock was a transfer of property by Ms. Read to a third party on behalf of Mr. Read within the meaning of Q&A-9.

---

[26](...continued)
MMP, instead of Mr. Read, purchase her MMP stock.  If Ms. Read wanted or preferred to have MMP, rather than Mr. Read, purchase her MMP stock, we believe that Ms. Read would have negotiated a property settlement that would have been reflected in the divorce judgment under which (1) Ms. Read would have been required to sell her MMP stock to MMP and MMP would have been required to give her cash and a note that was guaranteed by Mr. Read or (2) Ms. Read would have been required to sell her MMP stock to Mr. Read and MMP would have been required to guarantee the note that Mr. Read issued to Ms. Read (along with cash) in order to pay her for her MMP stock.  At a minimum, if Ms. Read wanted or preferred to sell her MMP stock to MMP, instead of to Mr. Read, Ms. Read would have negotiated a property settlement that would have been reflected in the divorce judgment under which Ms. Read, and not Mr. Read, would have been given the option of requiring (1) that she sell her MMP stock to MMP and (2) that MMP, and not Mr. Read, give her cash and a note that was guaranteed by Mr. Read.  The record in the instant cases is clear:  The only reason Ms. Read transferred her MMP stock to MMP was because Mr. Read wanted, and directed, her to do so by electing that she transfer that stock to MMP.
    Even assuming arguendo that Ms. Read's transfer of her MMP stock to MMP was in the interest of Ms. Read, and not in the interest of Mr. Read, a suggestion that is not supported and is in fact rejected by the record in the instant cases, Ms. Read was nonetheless acting as Mr. Read's representative--another common, ordinary meaning of the phrase "on behalf of"--in making that transfer to MMP.  That is because she was following and implementing Mr. Read's direction as reflected in his election under the divorce judgment that she transfer her MMP stock to MMP, which stock, absent Mr. Read's direction, Ms. Read was obligated to transfer to Mr. Read.

We shall now consider whether Ms. Read's February 5, 1986 transfer of MMP stock qualifies as one of the three situations described in Q&A-9. The first situation in Q&A-9 describes a transfer of property by the transferring spouse to a third party on behalf of the nontransferring spouse that is required by a divorce or separation instrument. We hold that Ms. Read's transfer of her MMP stock to MMP was required by the divorce judgment and fits within the first situation described in Q&A-9. Although that transfer was required by the divorce judgment only in the event that Mr. Read elected that Ms. Read transfer her MMP stock to MMP, instead of to Mr. Read, once Mr. Read made that election, which he did prior to Ms. Read's transfer of her MMP stock to MMP, that transfer was required by the divorce judgment.

We hold that Q&A-9 applies to Ms. Read's February 5, 1986 transfer of MMP stock and that, pursuant to section 1041(a), no gain shall be recognized by Ms. Read as a result of that transfer.[27] Mr. Read and MMP have indicated that if the Court were to find, as we have, that section 1041 applies to Ms. Read's transfer of her MMP stock to MMP, the determinations in the respective notices issued to Mr. Read and to MMP relating to that transfer should be sustained. Consequently, those determinations have

---

[27]We have considered all of the contentions and arguments of Mr. Read and MMP that are not discussed herein and find them to be without merit and/or irrelevant to our resolution of whether Q&A-9 and sec. 1041 apply to Ms. Read's transfer of her MMP stock to MMP.

become moot, and we shall not address them.

To reflect the foregoing and the concessions of the parties in these cases,

> An order recharacterizing Ms. Read's motion as a motion for partial summary judgment and granting it will be issued, and decision will be entered for petitioner in docket No. 19001-97.
>
> An order denying Mr. Read's and MMP's motion will be issued.

Reviewed by the Court.

COHEN, CHABOT, PARR, WHALEN, COLVIN, FOLEY, VASQUEZ, and GALE, JJ., agree with this majority opinion.

COLVIN, J. concurring:  I agree with the majority that section 1041 applies to the redemption of Ms. Read's stock and with its analysis supporting that result.  I also concur in the result as to Mr. Read for reasons stated herein.

I.  Thesis: Section 1041 and Q&A-9 Apply Broadly and
Prevent Nonsymmetrical Treatment of Spouses

The issue of whether, or how, section 1041 applies to redemptions incident to a divorce has been difficult for private parties, the Government, and the courts.[1]  Despite this past difficulty, this concurring opinion argues that section 1041 can provide predictable and fair results, with minimal risk of nonsymmetrical treatment of spouses, based on two principles. The first principle is (a) that Congress intended section 1041 to provide a broad rule of nonrecognition for transfers of property between spouses and former spouses incident to divorce, and (b) that section 1.1041-1T(c), Q&A-9, Temporary Income Tax Regs. (Q&A-9), 49 Fed. Reg. 34453 (Aug. 3, 1984), fully implements that intent for economically equivalent transactions involving third parties, including redemptions of stock held by one spouse.  The second principle is that, if applied according to their terms, section 1041(b) and corresponding language in the penultimate sentence of Q&A-9 fully achieve the congressional purpose of

---

[1]  Compare, e.g., Arnes v. United States, 981 F.2d 456 (9th Cir. 1992) (Arnes I), with Arnes v. Commissioner, 102 T.C. 522 (1994) (Arnes II).

avoiding whipsaw to the Government in cases where section 1041(a) applies by specifying how we treat the nontransferring spouse; i.e., "deeming" certain facts to have occurred.  That is, under section 1041(b) and the penultimate sentence of Q&A-9, Ms. Read is deemed to have transferred her MMP stock to Mr. Read, and Mr. Read is deemed to have transferred it to MMP to be redeemed. Thus, if section 1041(a) applies, we are required to assume that the stock MMP redeemed was Mr. Read's, not Ms. Read's.

Application of these two principles will properly implement Congressional intent both for section 1041(a), in making transactions between spouses tax free, and section 1041(b), in insuring against whipsaw of the Government.  For convenience in this concurring opinion, I refer to this analysis as the "section 1041(b)-Q&A-9 theory."

The dissenting opinion of Judge Ruwe emphasizes the importance of achieving symmetrical results between spouses in the stock redemption context if section 1041 applies.  However, it does not rely on the section 1041(b)-Q&A-9 theory.  Instead, it would apply what, for convenience, I will call the "primary and unconditional obligation requirement" theory, derived from law developed before section 1041 was enacted.  In this concurrence, I contend that the section 1041(b)-Q&A-9 theory is as effective in preventing whipsaw in the stock redemption context if section 1041(a) applies as the primary and unconditional obligation

requirement theory and that the former is clearly incorporated in section 1041, its legislative history, and Q&A-9, and the latter is not.  Further, I believe it is not for the courts to create barriers to qualifying for nonrecognition treatment under section 1041(a) and Q&A-9 that were not provided by the Congress or the Secretary.

II.  Section 1041 Applies Broadly to Transactions Between Divorcing Spouses

No gain or loss is recognized on a transfer of property from an individual to a former spouse if the transfer is incident to divorce.  See sec. 1041(a)(2).[2]  The phrase "incident to di

---

[2]  Sec. 1041(a) and (c) provides as follows:

SEC. 1041.  TRANSFERS OF PROPERTY BETWEEN SPOUSES OR INCIDENT TO DIVORCE.

(a) General Rule.--No gain or loss shall be recognized on a transfer of property from an individual to (or in trust for the benefit of)--

(1) a spouse, or

(2) a former spouse, but only if the transfer is incident to the divorce.

*    *    *    *    *    *    *

(c) Incident to Divorce.--For purposes of subsection (a)(2), a transfer of property is incident to the divorce if such transfer--

(1) occurs within 1 year after the date on which the marriage ceases, or

(continued...)

vorce" is broad, suggesting that Congress intended section 1041(a)(2) to apply broadly.  See <u>Arnes v. United States</u>, 981 F.2d 456, 458, 460 (9th Cir. 1992) (Arnes I); <u>Blatt v. Commissioner</u>, 102 T.C. 77, 79 (1994).  That reading is corroborated by the report of the Ways and Means Committee accompanying enactment of section 1041 in 1984, which states in pertinent part:

> The committee believes that, in general, it is inappropriate to tax transfers between spouses.  This policy is already reflected in the Code rule that exempts marital gifts from the gift tax, and reflects the fact that a husband and wife are a single economic unit.
> The current rules governing transfers of property between spouses or former spouses incident to divorce have not worked well and have led to much controversy and litigation.  Often the rules have proved a trap for the unwary as, for example, where the parties view property acquired during marriage (even though held in one spouse's name) as jointly owned, only to find that the equal division of the property upon divorce triggers recognition of gain.
>
> *     *     *     *     *     *     *
>
> The committee believes that to correct these problems, and make the tax laws as unintrusive as possible with respect to relations between spouses, the tax laws governing transfers between spouses and former spouses should be changed.

H. Rept. 98-432 (Part 2), at 1491-1492 (1984).

The Ways and Means Committee also said in its report:

> This nonrecognition rule applies whether the transfer is for the relinquishment of marital rights, for cash

---

²(...continued)
(2) is related to the cessation of the marriage.

or other property, for the assumption of liabilities in excess of basis, or for other consideration and is intended to apply to any indebtedness which is dis- charged.  * * *

Id. at 1492.

Thus, Congress made clear that it intended section 1041(a)

to apply broadly to transactions between divorcing spouses.[3]

   III.   Q&A-9 Extends Section 1041 Broadly to Transfers on Behalf of the Nontransferring Spouse Incident to Divorce

   Section 1.1041-1T(c), Q&A-9, Temporary Income Tax Regs.,[4]

---

   [3]   Sec. 1041 also applies broadly to transactions between nondivorcing spouses, but that situation is not present in the instant case.

   [4]  Sec. 1.1041-1T(c), Q&A-9, Temporary Income Tax Regs., 49 Fed. Reg. 34453 (Aug. 31, 1984), provides:

      Q-9.   May transfers of property to third parties on behalf of a spouse (or former spouse) qualify under section 1041?

      A-9.   Yes.   There are three situations in which a transfer of property to a third party on behalf of a spouse (or former spouse) will qualify under section 1041, provided all other requirements of the section are satisfied.  The first situation is where the transfer to the third party is required by a divorce or separation instrument.  The second situation is where the transfer to the third party is pursuant to the written request of the other spouse (or former spouse). The third situation is where the transferor receives from the other spouse (or former spouse) a written consent or ratification of the transfer to the third party. * * * In the three situations described above, the transfer of property will be treated as made directly to the nontransferring spouse (or former spouse) and the nontransferring spouse will be treated as immediately transferring the property to the third party.  The deemed transfer from the nontransferring spouse (or former spouse) to the third party is not a
(continued...)

extends section 1041(a) to transfers of property by a spouse (transferring spouse) to a third party on behalf of a former spouse (nontransferring spouse).  To qualify, the transfer must be "on behalf of" the transferring spouse.  The temporary regulations do not define or limit the term "on behalf of".

Q&A-9, as applied to divorcing spouses, properly implements section 1041(a) because it recognizes that section 1041 applies not only to transfers to the other spouse, but also to transfers to a third party "on behalf of" that other spouse.  Like section 1041(a), this facilitates the division of a marital estate incident to divorce without taxation to the spouse who is withdrawing assets from the marital estate.  There is no suggestion in the regulations that the "on behalf of" language has any purpose other than to make Q&A-9 apply as broadly as section 1041(a) does; i.e., to transactions made to divide a marital estate.

The language of section 1041(a), its legislative history, and the language of Q&A-9, clearly support the view of the majority that the "on behalf of" standard in Q&A-9 is satisfied if the transfer was "in the interest of" or was made by the transferring spouse acting "as a representative of" the nontransferring spouse.  Majority op. pp. 36-38.

---

[4](...continued)
transaction that qualifies for nonrecognition of gain
under section 1041.

I disagree with the contention in Judge Ruwe's dissenting opinion at 65-66 that Q&A-9 applies to redemptions only if the redemption satisfies a primary and unconditional obligation of the spouse whose stock is not being redeemed.  As stated by the majority, that requirement is not contained in or implied by the phrase "on behalf of".  I also disagree with the contention in the dissenting opinion of Judges Laro and Marvel that Q&A-9 does not apply to corporate redemptions or that it applies only to transfers to a third party to satisfy an obligation owed by the nontransferring spouse to the third party.  By their terms, section 1041(a) and Q&A-9 apply broadly to transfers of property "incident to divorce", which are "on behalf of" the other (nontransferring) spouse.  By choosing the "on behalf of" language, the Secretary appropriately defined eligibility for section 1041(a) broadly, as did Congress.  Q&A-9 does not state that it does not apply to redemptions, or that it applies only to transfers to a third party to satisfy an obligation owed by the nontransferring spouse to the third party.  Where the Secretary uses broad language to provide eligibility for a rule of nonrecognition, we need not and ought not supply our own exceptions.  Application of section 1041 and Q&A-9 to redemptions furthers the legislative purpose of making a transfer of property incident to divorce tax free in the case of a closely held corporation owned by a married couple.  In his dissent p. 58,

Judge Ruwe points out that, in the instant case and prior cases, "the Commissioner has consistently treated Q&A-9 as applying to divorce-related corporate redemptions, and this position has been adopted by the U.S. Court of Appeals for the Ninth Circuit in Arnes v. United States, 981 F.2d 456 (9th Cir. 1992)."

IV. Section 1041(b) and Q&A-9 Provide for Avoidance of Whipsaw

Section 1041(b)[5] is intended to ensure that the Government is not whipsawed as a result of inconsistent positions taken by former spouses. Section 1041(b) provides that, in the case of any transfer of property to which section 1041 applies, (1) the transferee is treated as if he or she acquired the property by gift and (2) the transferee takes the basis of the transferor. The Ways and Means Committee report accompanying enactment of section 1041 clearly stated the importance of avoiding whipsaw in cases where section 1041(a) applies. That committee report

---

[5] Sec. 1041(b) provides:

SEC. 1041(b). Transfer Treated as Gift; Transferee Has Transferor's Basis.--In the case of any transfer of property described in subsection (a)--

(1) for purposes of this subtitle, the property shall be treated as acquired by the transferee by gift, and

(2) the basis of the transferee in the property shall be the adjusted basis of the transferor.

states:

> Furthermore, in divorce cases, the government often gets whipsawed.  The transferor will not report any gain on the transfer, while the recipient spouse, when he or she sells, is entitled under the Davis rule to compute his or her gain or loss by reference to a basis equal to the fair market value of the property at the time received.

> \* \* \* \* \* \* \*

> Thus, uniform Federal income tax consequences will apply to these transfers notwithstanding that the property may be subject to differing state property laws.

H. Rept. 98-432 (Part 2), supra at 1491-1492.

As quoted supra note 4, the penultimate sentence of Q&A-9 implements the antiwhipsaw rule of section 1041(b) by providing:

> In the three situations described above, the transfer of property will be treated as made directly to the nontransferring spouse (or former spouse) and the nontransferring spouse will be treated as immediately transferring the property to the third party.

Thus, under section 1041(b) and Q&A-9, the following is deemed to occur if section 1041(a) applies to Ms. Read:

1.   She is deemed to transfer her stock to Mr. Read.

2.   Mr. Read is deemed to immediately transfer the stock to MMP.

Pursuant to the divorce judgment, Mr. Read elected for MMP to pay Ms. Read and to issue a promissory note to her.  However, despite these actual facts, because (in my view) section 1041(a) applies here, section 1041(b) and Q&A-9 specifically require us to analyze this transaction as if the stock were Mr. Read's at

the time of the redemption.[6]

### V. Should the Payment by MMP to Ms. Read Be Deemed To Be Made to Mr. Read?

Section 1041 and Q&A-9 do not state that the payment from MMP to Ms. Read is deemed to be made to Mr. Read and then to Ms. Read.[7]  However, it is undisputed that, because (in my view) section 1041(a) applies, under section 1041(b) and Q&A-9 we are to treat Ms. Read's stock redeemed by MMP as if it were Mr. Read's.  A stock owner would normally have the right to receive payment made in redemption of his or her stock.  Since we are required to treat Mr. Read as the owner of Ms. Read's MMP stock, it is thereby implied that we must attribute normal rights of stock ownership to him.  Thus, to give reasonable effect to

---

[6]  See Arnes I, 981 F.2d at 459, where the U.S. Court of Appeals for the Ninth Circuit used an analysis similar to the sec. 1041(b)-Q&A-9 described here; that is, the court treated the transferring spouse as having constructively transferred her stock to the nontransferring spouse, who then transferred the stock to the corporation.

[7]  If section 1041 and Q&A-9 apply, the transferring spouse recognizes no gain or loss under sec. 1041(a) on that spouse's actual or deemed transfer of property to the nontransferring spouse.  This is true even if the transferring spouse receives or is deemed to receive consideration from the nontransferring spouse for that property.  See sec. 1.1041-1T(c), Q&A-10, Temporary Income Tax Regs.  Under section 1041(b), the nontransferring spouse (here, Mr. Read) who actually receives property or is deemed to receive property from the transferring spouse has a basis in such property equal to the adjusted basis thereof in the hands of the transferring spouse.  This is true even if the nontransferring spouse pays or is deemed to pay the transferring spouse consideration for that property.  See sec. 1.1041-1T(c), Q&A-11, Temporary Income Tax Regs., 49 Fed. Reg. 34453 (Aug. 31, 1984).

section 1041(b) and the penultimate sentence of Q&A-9, we should treat Mr. Read as having a right to receive any payment MMP makes in redemption of what is deemed to be his stock, and thus he constructively receives any payment MMP makes in redemption of that stock to Ms. Read under general income tax principles. See Lucas v. Earl, 281 U.S. 111 (1930).

## VI. How Is Mr. Read Taxed?

Mr. Read and MMP indicated in their motion their belief that the primary and unconditional standard applies to section 1041, and that if section 1041 applies to Ms. Read's redemption of her MMP stock, respondent's determinations in the notices of deficiency issued to Mr. Read and MMP should be sustained. I concur with that result but for different reasons. Under the analysis of section 1041 and Q&A-9 herein, Mr. Read would be taxed on the constructive dividend he received on the transfer of Ms. Read's stock to MMP, not as a result of his litigating position in this case. Since Mr. Read constructively received MMP's payment to Ms. Read, he is taxable on it as a dividend under sections 302(d), 301(a), and 316.[8]

## VII. Primary and Unconditional Standard

A payment to a shareholder in redemption of stock is a constructive dividend to the remaining stockholder if the non-

---

[8] MMP had earnings and profits well in excess of the redemption payments during the years in issue.

redeeming stockholder had a primary and unconditional obligation to buy the stock. See, e.g., Arnes II; Hayes v. Commissioner, 101 T.C. 593, 606 (1993); Edler v. Commissioner, T.C. Memo. 1982-67, affd. 727 F.2d 857 (9th Cir. 1984).

The dissenting opinion of Judge Ruwe advocates the primary and unconditional obligation requirement theory to avoid whipsaw. See Judge Ruwe's dissent pp. 59-64. Under that view, the remaining shareholder (here, Mr. Read) would be taxed only if the transfer of the redemption proceeds satisfied a primary and unconditional obligation of his to Ms. Read. Because under that analysis the remaining shareholder would often escape taxation, to achieve symmetry Judge Ruwe would permit the departing shareholder (here, Ms. Read) to exclude gain or loss under section 1041(a) only if the transfer of the redemption proceeds satisfied a primary and unconditional obligation of the remaining shareholder.

If followed consistently in cases where section 1041(a) applies, both the section 1041(b)-Q&A-9 theory and the primary and unconditional obligation requirement theory would ensure symmetry. Thus, I disagree with the suggestion that, to achieve symmetry in the treatment of spouses, we need to apply the "primary and unconditional obligation requirement" theory to determine eligibility for section 1041(a) or Q&A-9. Congress clearly specified in section 1041(b) that, if section 1041(a)

applies, we must treat the nontransferring spouse as the owner of the transferring spouse's property.  Thus, assuming section 1041(a) applies, the question here is not how Mr. Read is taxed if MMP redeems Ms. Read's stock, even though those are the actual facts; instead, the question is how Mr. Read is taxed if MMP redeems his stock, because those are the deemed facts for "all purposes" under the income tax.  Sec. 1041(b).  The Secretary specifically implemented that concept in the penultimate sentence of Q&A-9.  As a result, symmetry is achieved without the need to apply the primary and unconditional obligation requirement to the nontransferring spouse.  Further, it is not for the courts to create their own barriers to qualifying for nonrecognition treatment under section 1041(a) and Q&A-9 not provided by Congress or the Secretary (e.g., imposition of a primary and unconditional obligation requirement, or creation of an exception for redemption transactions).

## VIII.  Conclusion

I concur because the analysis of the majority is fully consistent with the analysis in this concurring opinion.

PARR, WHALEN, FOLEY, VASQUEZ, and GALE, JJ., agree with this concurring opinion.

RUWE, J., dissenting: I disagree with the standards that the majority opinion uses for determining whether Ms. Read's transfer of stock to MMP qualifies as a transfer to which section 1041 applies.

When considering whether section 1041 can be applied to a transfer to a third party, it is necessary to examine the tax consequences for both spouses. This is because symmetrical treatment of both spouses is necessary to achieve the purposes of section 1041. The transaction in issue in this case is Ms. Read's transfer of stock to MMP. This transaction was a corporate redemption that left Mr. Read in control of MMP. A substantial body of case law has developed regarding the tax results of such redemptions.

Long before the enactment of section 1041, courts were required to deal with the tax ramifications of a corporate redemption of one shareholder's stock that left a remaining shareholder in control of the redeeming corporation. From one perspective, such a redemption conferred a control benefit on the remaining shareholder. Based on this, the Commissioner argued that the corporation's redemption payment constituted a constructive dividend to the remaining shareholder. On the other hand, the postredemption value of the corporation was diminished by the distribution of corporate funds used in the redemption, suggesting that the remaining shareholder may have received no real

benefit from the redemption.  From this latter perspective, the redemption simply reflects a shareholder's sale of stock to the corporation.  Given these considerations, courts have consistently held that a corporate distribution to redeem one shareholder's stock could be treated as a corporate dividend to the remaining shareholder <u>only</u> if the redemption transaction satisfied the remaining shareholder's primary and unconditional personal obligation to purchase the stock.  See <u>Arnes v. Commissioner</u>, 102 T.C. 522, 527 (1994) (Arnes II); <u>Edler v. Commissioner</u>, T.C. Memo. 1982-67, affd. 727 F.2d 857 (9th Cir. 1984).  As we explained in <u>Edler</u>:

> The issue is whether the stock redemption resulted in a constructive dividend to petitioner.  We are faced with the rule that where a corporation redeems stock which its remaining shareholder was obligated to buy, the remaining shareholder receives a constructive dividend.  <u>Wall v. United States</u>, 164 F.2d 462 (4th Cir. 1947).  However, the rule of <u>Wall</u> has been limited to those circumstances where the obligation of the purchasing shareholder is both primary and unconditional.  <u>Enoch v. Commissioner</u>, 57 T.C. 781 (1972); <u>Priester v. Commissioner</u>, 38 T.C. 316 (1962).  If, on the other hand, the corporation redeems stock which the remaining shareholder was not obligated to buy, no constructive dividend is received by that shareholder.  <u>Edenfield v. Commissioner</u>, 19 T.C. 13 (1952).

> Applying the above rules, certain disparate tax consequences become apparent.  When two shareholders own a corporation, there is no practical economic difference between using a stock redemption and using a dividend distribution to the remaining shareholder to fund the acquisition of the selling shareholder's stock.  Nevertheless, the tax consequences to the remaining shareholder are profoundly different.  A knowledgeable shareholder could negotiate a redemption by the corporation and escape harsh tax consequences to himself; whereas, a less knowledgeable shareholder might unwilling commit himself to effect the purchase and be

threatened with an unintended dividend.  Except for the tax
consequences, the shareholder's economic positions are
identical.  Obviously, in this area of the tax law, the form
employed is critical and taxpayers are free to choose the
form most beneficial to themselves.  It is against this
background that the rule of Wall has been limited to circum-
stances where the obligation which has been discharged is
both primary and unconditional.  [Fn. refs. omitted.]

If a redemption satisfied a primary and unconditional

obligation of the remaining shareholder, the remaining share-

holder was generally treated as having received a constructive

dividend.  See Hayes v. Commissioner, 101 T.C. 593, 599 (1993).

While the primary and unconditional standard is often referred to

as determinative of whether a redemption of one shareholder's

stock is a constructive dividend to the remaining shareholder,

this is an oversimplification.  The standard really determines

only whether a redemption of one shareholder's stock should be

treated as a corporate distribution  to the remaining share-

holder.[1]  While treating a redemption of one shareholder's stock

as a corporate distribution to the remaining shareholder has

generally resulted in a finding that the remaining shareholder

received a constructive dividend, dividend treatment also depends

---

[1]The constructive "treatment" of the participants in a
redemption that satisfied the primary and unconditional
obligation of the remaining shareholder under pre-sec.-1041 case
law would be the same as that prescribed in Q&A-9, Temporary
Income Tax Regs., 49 Fed. Reg. 134453 (Aug. 31, 1984); i.e., the
transferring shareholder would be treated as transferring stock
to the remaining shareholder who would be treated as transferring
the stock to the redeeming corporation in return for the
corporate distribution.

on the existence of corporate earnings and profits.[2]

The primary and unconditional standard is applicable to stock redemptions required by divorce judgments. For example in Edler v. Commissioner, supra, a divorce settlement and judgment required a redemption of the wife's corporate shares leaving the husband in control of the corporation. This Court and the Court of Appeals for the Ninth Circuit found that the redemption required by the "modified" settlement and judgment did not relieve the husband of a primary and unconditional obligation to purchase his wife's stock, and as a result, the husband did not receive a constructive dividend. In Edler, the "original" settlement and judgment required the husband to pay his wife for her stock interest. The Court of Appeals for the Ninth Circuit noted that had the "original" divorce settlement and judgment remained in effect, the corporation's redemption payment to the wife would have satisfied the husband's obligation and would have been treated as a dividend to the husband. See Edler v. Commissioner, 727 F.2d at 860.

Court opinions dealing with taxable years prior to the enactment of section 1041 generally do not discuss the tax treatment of the stockholder whose stock was being redeemed.

---

[2]No one questions that MMP had earnings and profits in excess of the redemption payments. MMP's income tax returns for the relevant years show unappropriated retained earnings in excess of $1 million.

This was because there was no question that the person whose stock was being redeemed would be taxable on any gain on the sale of his or her stock, regardless of who paid for the stock or whether the remaining shareholder was treated as having received a dividend.  The enactment of section 1041 introduced a broad rule of nonrecognition for transfers of property between spouses and former spouses incident to divorce.  Section 1041 makes no reference to transfers to third parties.  However, temporary regulations issued under section 1041 explain the circumstances in which a spouse's transfer to a third party qualifies as a transfer to which section 1041 applies.  See sec. 1.1041-1T(c), Q&A-9, Temporary Income Tax Regs. (Q&A-9), 49 Fed. Reg. 34453 (Aug. 31, 1984).

Q&A-9 does not specifically address a spouse's transfer of stock to the issuing corporation as part of a corporate redemption that was required by a divorce judgment.  However, in this case and prior cases, the Commissioner has consistently treated Q&A-9 as applying to divorce-related corporate redemptions, and this position has been adopted by the Court of Appeals for the Ninth Circuit in Arnes v. United States, 981 F.2d 456 (9th Cir. 1992).  See also Hayes v. Commissioner, supra, and Craven v. United States, 83 AFTR 2d 99-1268, 99-1 USTC par. 50336 (N.D. Ga. 1999), in which Q&A-9 was applied to divorce-related redemptions

of stock.[3]

One of the purposes for enacting section 1041 was to prevent divorcing spouses from whipsawing the Commissioner by taking inconsistent positions on divorce-related transfers. In Blatt v. Commissioner, 102 T.C. 77, 79 (1994), we explained:

> In part, Congress enacted section 1041 to replace the holding in United States v. Davis, 370 U.S. 65 (1962), that a divorce-related transfer of property in exchange for the release of marital claims resulted in recognition of gain to the transferor. H. Rept. 98-432, at 1491-1492 (1984). Before the enactment of section 1041, as a result of Davis, the transferring former spouse was taxable on a divorce-related transfer of appreciated property to his or her former spouse, and the recipient received a basis in the transferred property equal to its fair market value on the date of transfer. United States v. Davis, supra. Thus, the Government was whipsawed if such a transferor did not report any gain on a transfer of appreciated property. Accordingly, in 1984, Congress enacted section 1041 to remedy this whipsaw. H. Rept. 98-432, at 1491-1492 (1984). [Fn. ref. omitted.]

Q&A-9 specifies the way a transaction will be treated for both spouses and requires symmetrical results as to those spouses in order to prevent a whipsaw. Under Q&A-9, if a spouse's transfer to a third party qualifies for nonrecognition under section 1041, then she is treated as if she transferred the property to the other spouse (nontransferring spouse). Section

---

[3]It has been suggested that Q&A-9 can never apply to a corporate redemption. If this were true, a corporate redemption of one spouse's stock that satisfied the other spouse's primary and unconditional obligation to purchase that stock could result in both spouses being taxed on the redemption. Such a result is contrary to the objective of sec. 1041, the Commissioner's position, and existing case law.

1041(b)(2) provides that the nontransferring spouse's basis in the property is the same as the transferring spouse's basis. The nontransferring spouse is then <u>treated</u> as having transferred the property to the third party. Thus if Q&A-9 applies to this case, Ms. Read will be <u>treated</u> as having transferred her stock to Mr. Read, and Mr. Read's basis in the transferred stock will be the same as Ms. Read's--zero. Mr. Read will then be <u>treated</u> as having transferred the stock to MMP. It follows that the redemption proceeds should be <u>treated</u> as having been received by Mr. Read who in turn is <u>treated</u> as having paid Ms. Read.

Pursuant to Q&A-9, a transfer of property to a third party required by a divorce or separation instrument will be treated as qualified under section 1041 only if it is made "on behalf of" the nontransferring spouse. In order to accomplish this regulatory scheme and the statutory goal of eliminating whipsaws, the phrase "on behalf of" must have the same meaning when applied to each of the divorcing spouses.

There is nothing in Q&A-9 to indicate that the Commissioner was attempting to, or <u>could</u>, change the existing standards for determining whether a corporate redemption of one shareholder's stock could be treated as a distribution to the remaining shareholder. Indeed, Q&A-9 is a temporary regulation intended only to effect the legislative objective of section 1041. Nothing in section 1041, or its legislative history, suggests that it was

intended to displace longstanding principles used in determining whether a corporate redemption of one shareholder's stock could be treated as a distribution to the remaining shareholder. In Arnes II, we specifically held that the enactment of section 1041 did not change the primary and unconditional standard for determining whether a redemption of one spouse's stock can result in a constructive dividend to the other spouse. In Arnes II, 102 T.C. at 528, we stated: "The rationale of Edler [the primary and unconditional test] was not affected by the enactment of section 1041, and the case is still the law of the Court of Appeals for the Ninth Circuit, to which this case is appealable."[4] That is undoubtedly why all the parties in the instant case presented their arguments as if the primary and unconditional obligation standard applied for purposes of determining the inextricably related questions of whether Q&A-9 applies and whether the redemption of Ms. Read's stock should be treated as a dividend to Mr. Read.[5]

---

[4]It has been suggested that Arnes II did not discuss the impact that sec. 1041 and Q&A-9 would have on the spouse who was the remaining shareholder. However, as indicated above, in Arnes II we held that enactment of sec. 1041 had no impact on the tax treatment of the spouse who was the remaining shareholder after a divorce-related redemption of the other spouse's stock. This issue was clearly before the Court as shown by the various concurring and dissenting opinions in Arnes II.

[5]It has also been suggested that the primary and unconditional standard has no applicability to sec. 1041 and Q&A-9 because the primary and unconditional standard focuses on the

(continued...)

Respondent's position is that Mr. Read had a primary and unconditional obligation to purchase Ms. Read's stock and that the redemption of Ms. Read's stock (a necessary and integral part of which was her transfer of stock to MMP) satisfied Mr. Read's obligation. Mr. Read, MMP, and Ms. Read agree that the primary and unconditional obligation standard should be determinative of whether Ms. Read's transfer of stock was "on behalf of" Mr. Read within the meaning of Q&A-9. On this point, the parties are all correct.[6] The primary and unconditional standard is still controlling law for determining whether a divorce-related redemption distribution to one shareholder spouse can ever be a dividend to the remaining shareholder spouse. See Arnes II, supra. Because symmetrical treatment is required by section 1041, it should be obvious that the same primary and unconditional standard must also be the standard for determining whether Q&A-9 applies to a

---

[5](...continued)
purpose served by the corporate distribution to redeem stock rather than the spouse's transfer of stock to the corporation. However, a redemption distribution to a spouse that satisfies a primary and unconditional obligation of the other spouse is completely dependent on the transfer of stock to the redeeming corporation. If a redemption distribution that satisfies a primary and unconditional obligation of the nontransferring spouse is totally dependent on the transfer of stock being redeemed, then the transfer of stock to the redeeming corporation is an integral part of satisfying the primary and unconditional obligation of the nontransferring spouse.

[6]Ms. Read and respondent argue that the redemption satisfied Mr. Read's primary and unconditional obligation, while Mr. Read and MMP argue that Mr. Read was never primarily and unconditionally obligated to purchase Ms. Read's stock.

redemption transaction.

Arnes II was decided for a tax year to which Q&A-9 was applicable. Indeed, the Court of Appeals for the Ninth Circuit had applied Q&A-9 to Mrs. Arnes giving her the nonrecognition benefit of section 1041. See Arnes v. United States, 981 F.2d 456 (9th Cir. 1992).[7] Our majority opinion in Arnes II dealt only with whether Mr. Arnes had received a constructive dividend. In Arnes II, we found that the redemption of one spouse's stock could be a constructive dividend to the other spouse only if the redemption satisfied a primary and unconditional obligation of the nontransferring spouse. In Arnes II, the majority opinion expressed no view on whether the primary and unconditional standard had to be met in order for section 1041 and Q&A-9 to apply to a corporate redemption. That opened the possibility that a different standard would be applicable for purposes of giving section 1041 relief to the transferring spouse. This, in turn, opened the possibility that the Commissioner could be whipsawed. However, a total of 9 of the 18 Judges who partici- pated in the consideration of Arnes II (including the author of the majority opinion in Arnes II) indicated in concurring and dissenting opinions that section 1041 and Q&A-9 required symmet-

---

[7]The Court of Appeals for the Ninth Circuit concluded that the obligation to purchase Mrs. Arnes' stock was Mr. Arnes' obligation, not the corporation's. Thus, the Court of Appeals' opinion is consistent with the primary and unconditional obligation standard.

rical results with respect to both spouses.

The majority now holds that the "on behalf of" requirement in Q&A-9 is satisfied by a standard that is substantially lower and less precise than the primary and unconditional obligation test of Edler v. Commissioner, T.C. Memo. 1982-67, and Arnes II. The majority holds that the "on behalf of" test is satisfied if the transfer was "in the interest of" or was made by the transferring spouse acting "as a representative of" the nontransferring spouse. This standard presumably could be met if the nontransferring spouse received some general benefit or if the obligation of the nontransferring spouse was either secondary, conditional, or both. Based on this lower standard, the majority holds that Ms. Read is entitled to rely on section 1041 and, therefore, need not recognize gain on the transfer of her stock.[8] I believe this is an error.

One of the problems with simply applying the dictionary meaning of "on behalf of" to a divorce-related corporate redemption is that the redemption will usually, in a general sense, be in the interest of both the spouse whose stock is redeemed and the spouse who is the remaining shareholder. For example, the

---

[8]It has also been suggested that sec. 1041 and Q&A-9 apply to all divorce-related transactions that are made to divide a marital estate. This approach is more encompassing than the majority's approach and is contrary to established precedent. See Ingham v. United States, 167 F.3d 1240 (9th Cir. 1999); Blatt v. Commissioner, 102 T.C. 77 (1994).

transferring spouse receives money from the corporation in return for her stock.  This receipt of money (especially if it represents a substantial gain as in this case) benefits the transferring spouse.  Oftentimes the transfer will also generally benefit the spouse who is the remaining shareholder.  This is the same dilemma that courts confronted in trying to determine whether a redemption of one shareholder's stock could ever be considered a constructive dividend to the remaining shareholder.  As a result, the courts fashioned the primary and unconditional obligation test that we applied in Arnes II.  The fact that Ms. Read's transfer was simply "in the interest of" Mr. Read or that Mr. Read received "some general benefit" is an insufficient reason for us to conclude that Mr. Read could have a constructive dividend.  See Ingham v. United States, 167 F.3d 1240 (9th Cir. 1999), where the court explained that a transfer to a third party would not be considered "on behalf of" the other spouse within the meaning of Q&A-9 unless the transfer relieved the other spouse of a "specific legal obligation or liability."  Id. at 1244.  The fact that the other spouse receives "some general benefit" is insufficient.  Id.

Because Q&A-9 controls the tax treatment of both spouses, a divorce-related corporate redemption transaction should not be considered to be a transfer "on behalf of" the nontransferring spouse within the meaning of Q&A-9 unless the nontransferring

spouse had a primary and unconditional obligation to purchase the redeemed stock.

The majority's error is compounded by concluding that Mr. Read must recognize a constructive dividend but failing to give any legal explanation for this result. How could Mr. Read have a constructive dividend in light of our prior Court-reviewed opinion in Arnes II where we said that section 1041 made no change in prior law and held that a redemption of one spouse's stock cannot result in a constructive dividend to the other stockholder spouse, unless the redemption satisfied the latter's primary and unconditional personal obligation to purchase the redeemed shares? This is a problem that the majority refuses to confront. Instead, the majority simply states that Mr. Read and MMP "indicated" that if the Court were to find that section 1041 applies to Ms. Read, then respondent's determinations regarding Mr. Read and MMP should be sustained. The majority's attempt to extricate itself from this dilemma by latching onto an isolated statement in the motion filed by Mr. Read and MMP is unjustified by the record and fundamentally unfair.

The "indication" by Mr. Read and MMP is taken out of context. The full argument made by Mr. Read and MMP is that Q&A-9 cannot apply to a corporate redemption unless the redemption satisfies a primary and unconditional obligation of the nontransferring spouse. They "indicate" that if this standard is

met and Q&A-9 applies, then respondent's determinations should be sustained.  To take the latter statement out of context after having rejected the argument on which it is predicated is totally unwarranted.  In any event, we should never rely upon and apply a party's statement of law that is contrary to a holding contained in a prior Court-reviewed opinion of this Court that is still binding precedent.[9]  No matter how convenient it may be to avoid unreconcilable differences in our opinions, justice demands that we decide issues of law that control the outcome of cases that come before us.  Today's majority opinion puts in place one legal standard for determining whether a transferring spouse receives the benefits of section 1041, while leaving in place the different and more stringent standard of Arnes II for purposes of determining whether the corresponding tax burdens can be placed on the nontransferring spouse.  This opens the door in future cases for both spouses to escape the tax impact of a divorce-related transfer of appreciated property and therefore contravenes one of the purposes of section 1041.

The question we should ask and answer is whether MMP's redemption of Ms. Read's stock satisfied a primary and unconditional obligation of Mr. Read.  If the answer is yes, we should hold that Q&A-9 applies, Mr. Read had a constructive dividend,

---

[9]The majority does not purport to overrule or modify Arnes II.

and Ms. Read gets the benefit of section 1041.  If Mr. Read did not have a primary and unconditional obligation to purchase Ms. Read's stock, then we should hold that Q&A-9 does not apply, the redemption of Ms. Read's stock did not result in a constructive dividend to Mr. Read, and Ms. Read's transfer of stock to MMP should be treated as a simple redemption resulting in a taxable capital gain to Ms. Read.

BEGHE, <u>J</u>., agrees with this dissent.

HALPERN, J., dissenting:

I.    Introduction

On February 5, 1986, Ms. Read disposed of all of her shares of stock in Mulberry Motor Parts, Inc. (the shares and MMP, respectively) by transferring the shares to MMP (the transfer). In consideration thereof, MMP paid Ms. Read $200,000 and agreed to pay her an additional $638,724 in installments (with interest).  Ms. Read's adjusted basis in the shares was zero, and she realized a gain on the transfer.  See sec. 1001(a).  That gain must be recognized to her unless some nonrecognition provision applies.  See sec. 1001(c).  Ms. Read relies on section 1041(a) to avoid the recognition of gain.  Section 1041(a) provides:

> SEC. 1041(a). General Rule.--No gain or loss shall be recognized on a transfer of property from an individual to (or in trust for the benefit of)--
>
> (1) a spouse, or
>
> (2) a former spouse, but only if the transfer is incident to the divorce.[1]

Ms. Read is an individual, and she claims that no gain is recognized to her since she transferred the shares (property) to her former spouse (Mr. Read) incident to their divorce.  Mr. Read disagrees that the transfer was to him.  Ms. Read and Mr. Read agree that the question of whether the transfer was to him should be answered by determining whether he had a primary and uncondi-

---

[1]The term "incident to the divorce" is defined in sec. 1041(c), and that definition is not in issue here.

tional obligation to purchase the shares.  The majority holds that such an inquiry is inappropriate.  I disagree.  I further disagree with what seems to me to be the majority's evocation of the principles of Commissioner v. Court Holding Co., 324 U.S. 331 (1945), to determine whether Ms. Read sold the shares to Mr. Read.

II.  Bootstrap Acquisitions

Mr. Read acquired virtually complete ownership of MMP without expending any of his own funds.  He did so by arranging for MMP to redeem the shares.  Such an acquisition, where the acquirer uses funds of the corporation to aid in his acquisition of control, is sometimes referred to as a "bootstrap acquisition".  A part owner of a corporation can use the corporation's funds to acquire complete ownership of the corporation in one of two ways.  One, he can arrange for the corporation to purchase the seller's shares.  Two, he can purchase the seller's shares and cause the corporation to redeem those shares from him.  There is no practical difference between those alternatives.  In both cases, the seller receives the same amount, and the remaining owner (sometimes, the buyer) becomes the sole owner of the corporation, whose assets are reduced by the same amount.  It is well settled, however, that the difference in form between those alternatives may result in different income tax consequences (at least for the buyer).  As professors Bittker and Lokken put it:

> If the buyer purchased all of the seller's stock and later recouped some of the cash outlay by causing the corporation to redeem part of the newly acquired stock, the redemption distribution would be a dividend to the extent of earnings and profits because, as a pro rata distribution, it could not meet the standards of §§302(b)(1), (2), or (3). The buyer, however, avoids dividend consequences where the redemption is from the seller unless the buyer makes the mistake of undertaking a personal obligation to purchase the shares before the corporation agrees to redeem them.

3 Bittker & Lokken, Federal Taxation of Income, Estates, & Gifts, par. 93.1.5, at 93-17 (2d ed. 1991).

Although the form of the acquisition may be tailored to suit the buyer's tax status (a corporate buyer may prefer the dividend treatment that, given sufficient earnings and profits, generally would accompany the redemption of shares purchased from the seller), once it is tailored, the buyer is stuck with the chosen form. In an early leading case, Wall v. United States, 164 F.2d 462 (4th Cir. 1947), the taxpayer contracted to purchase stock from a co-shareholder, agreeing to make a cash downpayment and to deliver his notes for the remainder of the purchase price. The taxpayer made the downpayment and received the stock, which he transferred to two trustees, to be held by them as security for the notes. After paying the first note, he transferred his equity in the stock to the corporation and caused it to pay the remaining notes as they became due. The Court of Appeals for the Fourth Circuit had no difficulty in finding that the taxpayer's transfer of his equity to the corporation in consideration of the

corporation's assumption of his liability was a redemption of the underlying stock and that the redemption and the payment of the remaining owner's note that became due in the year in question were essentially equivalent to the distribution of a taxable dividend.  See id.

In a variation on Wall, in Sullivan v. United States, 363 F.2d 724 (8th Cir. 1966), the Court of Appeals for the Eighth Circuit held that, if a buyer is subject to an executory, primary, and unconditional obligation to purchase the shares of the seller, but instead causes the corporation to purchase those shares, the purchase results in a constructive distribution to the buyer, because it discharges his obligation.  In Sullivan, the Court of Appeals found that, after the transaction was complete, (1) the taxpayer's personal obligation to purchase the stock had been discharged, (2) the taxpayer owned all of the outstanding shares of stock of the corporation, (3) the corporation's assets were decreased by the amount paid to the seller for his stock, and (4) that stock was held by the corporation as treasury stock.  See id. at 729.  Although the Court of Appeals is not explicit on the point, it appears that it considered the taxpayer as having constructively received the stock from the seller, which stock the taxpayer then transferred to the corporation in consideration of the corporation's constructive distribution to him in redemption of that stock.  The Court of Appeals

rejected the taxpayer's argument that he had received a distribu-tion in redemption of shares that was a distribution in full payment in exchange for the stock and not a redemption essen-tially equivalent to a dividend.  See id. at 729-730.

Thus, if a buyer wishes to accomplish a bootstrap acquisi-tion, the buyer, once having put the Wall type format into legally enforceable form, cannot avoid the tax consequences of a redemption from him of the seller's stock by having the corpora-tion pay the seller directly.  Nevertheless, if the corporation simply agrees to redeem the seller's stock and pays for the stock in installments, over time, and the payments do not discharge any obligation of the remaining owner, the payments do not constitute constructive distributions to the remaining owner.  See Edenfield v. Commissioner, 19 T.C. 13 (1952).  That is true even if the remaining owner guarantees performance by the corporation, pledges his shares as security for the deferred payments, or agrees to buy the shares if the corporation defaults.  See id.; Buchholz Mortuaries, Inc. v. Commissioner, T.C. Memo. 1990-269; Rev. Rul. 69-608, 1969-2 C.B. 42 (Situation 5).

The logic of the bootstrap acquisition cases leads to the conclusion that, where the buyer has already purchased the seller's stock, as in Wall v. United States, supra, or has a primary and unconditional obligation to do so, as in Sullivan v. United States, supra, the transfer of that stock to the corpora-

tion is in satisfaction of the buyer's obligation to surrender for redemption stock that, actually, in Wall, or constructively, in Sullivan, he had purchased from the seller. Any transfer by the seller directly to the corporation would, under that logic, be on behalf of the buyer. Contrariwise, if the remaining shareholder has not purchased the seller's stock, and has no obligation to do so, as in Edenfield v. Commissioner, supra, the transfer to the corporation should not be viewed as on the remaining shareholder's behalf. Since there is no practical difference between the Wall and Edenfield type formats, the choice of form by the parties to the transaction plays a dominant role in determining the income tax consequences that will follow, and the crucial distinction is whether the corporation satisfies a legal obligation of the remaining shareholder to purchase the redeemed stock. No matter how close a taxpayer comes to undertaking a legal obligation to purchase the redeemed stock, the Wall principle should not apply unless that obligation was in fact undertaken. Thus, in S.K. Ames, Inc. v. Commissioner, 46 B.T.A. 1020 (1942), we construed a contract to purchase stock that provided that the taxpayer would "purchase or cause to be purchased" the stock. We held that the promise to "purchase or cause to be purchased" provided several methods for satisfying the obligation created under the contract, and, therefore, the taxpayer incurred no absolute obligation to purchase the stock.

See also <u>Buchholz Mortuaries, Inc., v. Commissioner</u>, <u>supra</u>
(contract accorded taxpayers, "or their assigns" right to pur-
chase stock; purchase by corporation (assignee) did not discharge
personal and primary obligation of taxpayers); <u>Bunney v. Commis-
sioner</u>, T.C. Memo. 1988-112 (similar).  In <u>Kobacker v. Commis-
sioner</u>, 37 T.C. 882 (1962), the taxpayer negotiated to buy all of
the capital stock of a corporation.  The purchase agreement
contained the following paragraph:

> Buyer * * * is to have the right to assign this Agree-
> ment to a corporation, thereby releasing Buyer there-
> from, and substituting such Corporation in the place of
> Buyer under this Agreement, with the same force and
> effect as if this Agreement were originally made with
> such Corporation, provided that such Corporation shall,
> by writing, agree to be bound by all of the terms,
> covenants and conditions of this Agreement.  [<u>Id.</u> at
> 885.]

In <u>Kobacker</u>, we held that the taxpayer had assumed no personal
obligation to purchase the stock under that contract.  See <u>id.</u> at
896.

The fact that a bootstrap acquisition is incident to a
divorce has no bearing on whether the buyer (for convenience,
husband) and seller (wife) are held to the form upon which they
have agreed.  If the husband's obligation to purchase the wife's
shares is primary and unconditional, then he is in constructive
receipt of those shares notwithstanding that, on his behalf, the
wife has transferred them to the corporation.  If the husband
does not have a primary and unconditional obligation to purchase

the wife's shares, then he is not in constructive receipt of those shares, and the wife's transfer of those shares to the corporation is not on his behalf. If, pursuant to section 1041(a), the wife gains a tax advantage from the form settled upon by the parties (or loses a tax advantage if she realizes a loss on the disposition of the shares), then so be it. The bootstrap acquisition rules are fairly well settled and give the parties the flexibility to negotiate a mutually acceptable format for the wife to dispose of her shares. Those rules are consistent with the construction of section 1041(a) set forth in section 1.1041-1T(c), Temporary Income Tax Regs., 49 Fed. Reg. 34453 (Aug. 31, 1984). I see no reason why the primary and unconditional analysis is inappropriate to an analysis of the tax consequences in this and similar cases.

III. Facts at Hand

By agreement incorporated into the divorce judgment, Ms. Read was obligated to sell the shares to Mr. Read or, at his election, MMP or the ESOP Plan of MMP (the ESOP). Mr. Read, MMP or the ESOP, as the case would be, was obligated to purchase the shares. Payment for the shares was to be made in installments, with Ms. Read retaining a security interest in the shares. Mr. Read was to guarantee payment of the installments if he elected to have MMP or the ESOP make the payments. Subsequent to the divorce, Mr. Read elected to have MMP purchase the shares.

Mr. Read, Ms. Read, and one other individual constituted the board of directors of MMP (the board). By unanimous written consent, the board consented to MMP's purchase of the shares. Subsequently, Ms. Read and MMP entered into a stock purchase agreement, and, pursuant thereto, MMP acquired the shares from her.

Since Mr. Read had the right to assign his obligation to purchase the shares, I do not believe that his obligation to purchase the shares was primary and unconditional. The facts here are similar to the facts in S. K. Ames, Inc. v. Commissioner, supra; Buchholz Mortuaries, Inc. v. Commissioner, supra; and Bunney v. Commissioner, supra. Therefore, I would find that the transfer was to MMP, and not to (or on behalf of) Mr. Read.

The majority finds that the transfer did not satisfy any liability or obligation of Mr. Read's. Nevertheless, the majority finds that Ms. Read was, in effect, acting as Mr. Read's agent in transferring the shares to MMP. Majority op. pp. 36-38. Without citing any authority, the majority appears to be relying on the principles of Commissioner v. Court Holding Co., 324 U.S. 331 (1945), where a corporation was taxed on gain on a sale by shareholders of property distributed by the corporation because the corporation went so far toward the sale before the distribution that the sale was in substance made by the corporation.

In Court Holding Co., the Supreme Court said:

The incidence of taxation depends upon the substance of

a transaction. The tax consequences which arise from gains from a sale of property are not finally to be determined solely by the means employed to transfer legal title. Rather, the transaction must be viewed as a whole, and each step, from the commencement of negotiations to the consummation of the sale, is relevant. A sale by one person cannot be transformed for tax purposes into a sale by another by using the latter as a conduit through which to pass title. To permit the true nature of a transaction to be disguised by mere formalisms, which exist solely to alter tax liabilities, would seriously impair the effective administration of the tax policies of Congress. [Id. at 334; fn. ref. omitted.]

The majority appears to be applying Court Holding Co. principles to determine that, in substance, Ms. Read sold the shares to Mr. Read although, on his behalf, she transferred them to MMP. That is an inappropriate analysis in the bootstrap acquisition area, where there is no practical difference between the two ways of accomplishing the bootstrap acquisition and the only relevant distinction is form, which is manifest by legal rights and duties. See the discussion by professors Bittker and Lokken at 3 Bittker & Lokken, Federal Taxation of Income, Estates, & Gifts, par. 93.1.5, at 93-19 (2d ed. 1991).

IV. Conclusion

Since I believe that Ms. Read has failed to prove that the transfer was to Mr. Read, I would hold section 1041(a) inapplicable and hold that she recognized gain on the transfer. Mr. Read, of course, had no item of gross income on account of the transfer.

WELLS and BEGHE, JJ., agree with this dissent.

BEGHE, J., dissenting:  As a long-time continuing proponent of the view that the "on behalf of" standard of Q&A-9 applying section 1041 should be equated with the "primary and uncondi- tional obligation" standard of traditional redemption tax law, see Arnes v. Commissioner, 102 T.C. 522, 531-542 (1994) (Beghe, J., concurring); Blatt v. Commissioner, 102 T.C. 77, 85-86 (1994) (Beghe, J., concurring), I have joined the dissenting opinions of Judges Ruwe and Halpern.  However, I write on to express my own views of how the cases of Mr. and Mrs. Read should be decided and to try to provide some perspective on the variety of expressed views about the decisions and their governing rationales.

Two preliminary observations are in order.

First, it is not accurate to say, as does the majority opinion:  "Respondent's role here is that of a stakeholder"[1] (majority op. at 17).  Mr. Read and MMP have much more at stake than Mrs. Read because the combined deficiencies of Mr. Read and MMP substantially exceed Mrs. Read's deficiencies:[2]  Mrs. Read

---

[1] Defined by Black's Law Dictionary 1412 (7th ed. 1999) as: "A disinterested third party who holds money or property, the right to which is disputed between two or more parties." (Emphasis supplied.)

[2] The writer observed in Arnes v. Commissioner, 102 T.C. 522, 541 (1994) (J. Beghe, concurring):

> Hewing to the bright line rules of Rev. Rul. 69-
> 608, supra, in the marital dissolution context will
> reduce the tax costs of divorce for the owners of small
> businesses held and operated in corporate form.  If the
> shareholder spouses can negotiate their separation

(continued...)

has already reported the interest portion of the deferred payments; Mrs. Read's only adjustments in issue stem from her failure to include the principal payments in taxable gain for 1989 and 1990. Mr. Read's deficiencies arise from respondent's inclusion in his ordinary income as dividends of both principal and interest payments on the stock purchase for 1988, 1989, and 1990.[3] Mr. Read also suffers the indirect financial burden of

---

[2](...continued)
agreement with the assurance that the redemption will be tax free to the remaining shareholder and a capital gain transaction to the terminating shareholder, the overall tax costs will ordinarily be less than if the terminating spouse qualifies for nonrecognition under section 1041, but the remaining spouse suffers a dividend tax. This will leave a bigger pie to be divided in setting the consideration for the shares to be redeemed. [Fn. ref. omitted.]

Although for the years in issue in the cases at hand, long-term capital gain and ordinary income were subject to tax at the same rates, the writer's observation in Arnes applies to more recent and current taxable years, in which long-term capital gains are subject to tax at lower rates than ordinary income.

Even in cases in which there are other remaining shareholders of the distributing corporation, treating the corporation's payment to the departing shareholder ex-spouse as a distribution in redemption of the purchased stock to the remaining shareholder ex-spouse will cause the constructive distribution to be treated as a dividend to the remaining shareholder ex-spouse under sec. 301 rather than as a substantially disproportionate redemption under sec. 302(b)(2) qualifying as a distribution in payment in exchange for the stock under sec. 302(a), with resulting capital gain treatment. This is because the proportionate interest in the corporation of the remaining shareholder ex-spouse will always be increased as a result of the reduction in the number of outstanding shares that occurs by reason of the redemption.

[3] Mr. Read has not put in issue respondent's determination
(continued...)

the disallowance of the interest deductions claimed by MMP for the same years.[4]  I note, without further comment, as does the majority opinion (id.), that "respondent has 'indicated that Ms. Read has the better argument that she should not recognize any gain from the sale of her stock pursuant to I.R.C. § 1041.'"

Second, about the procedural settings on appeal:  An appeal in Mrs. Read's case would go to the Court of Appeals for the Ninth Circuit; Mr. Read's appeal would go to the Court of Appeals for the Eleventh Circuit.  Therefore, a whipsaw of respondent is not out of the picture, irrespective of how we decide the cases

---

[3](...continued)
that he is liable to dividend treatment on the subsequent years' payments of interest and principal on the note for years following the year the note was issued.  Conceivably, the correct approach would have been for respondent to treat the fair market value of the note as a dividend distribution to him in the year of issuance, see Maher v. Commissioner, 55 T.C. 441 (1970), supplemented 56 T.C. 763 (1971), revd. and remanded 469 F.2d 225 (8th Cir. 1972); see also Bittker & Eustice, Federal Income Taxation of Corporations and Shareholders, par. 8.23, (1999 Cum. Supp. 1), a year for which the period of limitation on assessment of a deficiency has expired.  See also note 2 and accompanying text of the joint dissenting opinion of Judges Laro and Marvel. There is no occasion to comment on how that issue should be decided if Mr. Read had raised it in a timely fashion.

[4] It is understood that Mr. Read has not raised the point-- and it is not in issue in the cross-motions for partial summary judgment before the Court--that if the corporate payments are to be included in his gross income as constructive dividends, then he is entitled to deduct the interest portion of the payments as business interest.  There is no occasion here to comment on this point, other than to observe that, under the analysis of the concurring opinion, the obligation to pay interest to Mrs. Read would be the deemed obligation of Mr. Read, rather than that of the corporation.  Cf. Seymour v. Commissioner, 109 T.C. 279 (1997).

of Mr. Read and Mrs. Read.[5]

It has been difficult to reach consensus about how to write up this case, much less decide it, because one or another of four different approaches might be used to determine the relationship of the "on behalf of" and "primary and unconditional obligation" standards.  A summary and comment follow on each of the possible approaches.

(1) My continuing view is that the "primary and unconditional obligation" standard of traditional redemption tax law and the "on behalf of" standard of Q&A-9 should be construed and applied consistently; redemption tax law should govern the interpretation and application of the "on behalf of" standard.  The correct application of this view in the case at hand would result in no taxable income to Mr. Read because he never had the primary and unconditional obligation to purchase the stock; he was entitled under both the settlement agreement and the divorce decree to lay his purchase obligation off on MMP, which he did.  See Enoch v. Commissioner, 57 T.C. 781 (1972); Kobacker v. Commissioner, 37 T.C. 882 (1962); Rev. Rul. 69-608, 1969-2 C.B. 43, 44 (Situation 6).  Furthermore, MMP became primarily and unconditionally obligated to purchase and pay for the stock, notwithstanding that Mrs. Read became entitled to Mr. Read's

---

[5] Cf., e.g., Baptiste v. Commissioner, 100 T.C. 252 (1993), revd. 29 F.3d 433 (8th Cir. 1994), affd. 29 F.3d 1533 (11th Cir. 1994).

guaranty--his secondary obligation--and a pledge of the redeemed shares to secure the satisfaction of MMP's obligation. See Bennett v. Commissioner, 58 T.C. 381 (1972); Edenfield v. Commissioner, 19 T.C. 13 (1952).

The Reads' settlement agreement and divorce decree, which tied the amounts of Mr. Read's obligation to make periodic alimony payments to initial and continued compliance with the provisions for payment for Mrs. Read's stock, did not saddle Mr. Read with the primary and unconditional obligation to purchase and pay for Mrs. Read's stock.[6] The obligation to purchase and pay for her stock was assigned to and assumed by MMP as its primary and unconditional obligation.

(2) Judges Laro and Marvel believe that Q&A-9 just does not apply to redemptions. Adoption of this approach could cause both individual parties to a redemption of the stock of a divorcing spouse to incur tax liability if they are not well advised. In most cases the departing shareholder ex-spouse would recognize capital gain on the transaction that terminates his or her stock

---

[6] Even if the standard espoused by Judges Ruwe and Halpern and the writer should be adopted, a Judge adopting that standard might conclude that Mr. Read did not divest himself of the primary and unconditional obligation to purchase Mrs. Read's stock. The ground of that conclusion, with which the writer would disagree, is that the integration of and reciprocal relationship between Mr. Read's alimony obligations and MMP's continuing obligation to complete the scheduled payments in satisfaction of the obligation to purchase Mrs. Read's stock left Mr. Read with the primary and unconditional continuing obligation to purchase her stock.

interest.  Whether the remaining shareholder ex-spouse has a dividend would depend on whether he or she is considered as having the primary and unconditional obligation to purchase the departing shareholder's stock that was satisfied by the redemption.

If the remaining shareholder is considered to have had his primary and unconditional obligation to purchase the stock satisfied by the redemption, then under general principles of tax law the redemption should be recast as a purchase of the stock by the remaining shareholder, followed by his contribution of the stock to the corporation in exchange for the cash that he constructively received and used to purchase the stock.  This recast transaction results in a distribution of cash essentially equivalent to a dividend to him under sections 301 and 302(b)(1), and the departing shareholder ex-spouse should be entitled to nonrecognition of gain under section 1041.

(3) In Judge Colvin's view, the "on behalf of" standard of Q&A-9 trumps traditional redemption tax law.  I don't favor this view because it results in almost all cases under current law in a greater total tax liability to the private parties.  Its adoption would mean that less will be available to pay off the departing shareholder ex-spouse.[7]  However, Judge Colvin's view provides clear and consistent treatment of the ex-spouses and is

---

[7] See supra note 2.

preferable to the majority opinion.  Adoption of Judge Colvin's view by a majority of the Court would provide clear guidance as to how we would resolve the treatment of both private parties in this type of consolidated case.

(4) Maybe the "on behalf of" and "primary and unconditional obligation" standards, in a hard-fought consolidated case with no improvident concession by either private party, can be so applied that both ex-spouses escape tax.[8]  Both traditional redemption tax law and section 1041 reflect the same policy of facilitating transactions by removing tax impediments.  Maybe respondent, instead of being a putative stakeholder, is left holding an empty bag!  I don't think so.

Some concluding thoughts:  the parties' motions and memos in the case at hand leave the impression that Mr. Read's indication--he loses if Mrs. Read wins--was based on what the majority opinion now tells the parties was their mistaken belief about the applicable

---

[8] There's another way (a far-out fifth possibility) the Court could hold that both parties escape tax, which the Court has properly rejected.  There is a view (disagreed with in the writer's Arnes v. Commissioner, 102 T.C. 522 (1994) (Arnes II) concurrence) that the Ninth Circuit Court of Appeals, with whose views the Court expressed disagreement in Blatt and Arnes II, has indicated in Arnes v, United States, 981 F.2d 456 (9th Cir. 1992) (Arnes I), and Ingham v. United States, 167 F.3d 1240 (9th Cir. 1999), that it reads the "on behalf of" standard more expansively than the Court has been willing to do.  The Court could have decided in favor of Mrs. Read under Golsen v. Commissioner, 54 T.C. 742, 757 (1970), affd. 445 F.2d 985 (10th Cir. 1971), and decided in favor of Mr. Read by applying the "primary and unconditional standard", as Judge Halpern and the writer would do, or the view of Judges Laro and Marvel that the "on behalf of" standard of Q&A-9 does not apply to redemptions.

legal standard.  If we are not going to adopt the view that the "on behalf of" and "primary and unconditional obligation" standards are to be applied consistently, so that there need not be a winner and a loser as between the ex-spouses, then Mr. Read should not be bound by his "indication".  My objective in making this suggestion, against the background of what we said and did in Blatt v. Commissioner, 102 T.C. 77 (1994), Hayes v. Commissioner, 101 T.C. 593 (1993), and Arnes and our unsuccessful efforts to reach agreement in this case, is to resolve it in a way that will result in a holding on the merits of the cases of both ex-spouses that will provide comprehensive guidance for future cases.  The parties and their counsel and the public and the tax bar, who are looking to us for guidance in this recurring situation, deserve no less.

Unfortunately, the majority opinion's rejection of a rule of equivalence perpetuates the uncertainty.  What "every schoolboy knows," compare State Pipe & Nipple Corp. v. Commissioner, T.C. Memo. 1983-339, about how to avoid constructive dividend treatment to the remaining shareholder under traditional redemption tax law will continue, as a result of the variety of views expressed, to fail to provide the guidance that the divorcing spouses and their advisers deserve and need.

I renew my pleas for guidance in the form of an interpretative regulation or a Congressional fix.  See Arnes v. Commissioner, 102 T.C. 542 n.10.

LARO and MARVEL, JJ., dissenting:  The majority holds today that section 1.1041-1T(c), Q&A-9 (Q&A-9), Temporary Income Tax Regs., 49 Fed. Reg. 34453 (Aug. 31, 1984), permits a spouse[1] to avoid recognizing gain which she realized from a redemption of her stock in connection with her divorce.  Because we do not believe that section 1041, either textually or as interpreted in Q&A-9, applies to stock redemptions incident to divorce, we respectfully dissent.

We summarize the critical facts of this case as follows. In connection with his divorce from Ms. Read, Mr. Read agreed to purchase Ms. Read's stock in MMP at a stated price, or, at his election, to cause MMP to redeem Ms. Read's stock.  Mr. Read elected under the terms of their divorce judgment to cause MMP to redeem the stock in his stead.  MMP authorized the redemption and entered into a binding stock purchase agreement with Ms. Read.  Pursuant to that agreement, in 1986, MMP redeemed Ms. Read's stock, paid Ms. Read $200,000 toward the redemption price, and issued Ms. Read a promissory note representing the balance of the redemption price.  MMP paid Ms. Read $50,000 of the promissory note's principal during each year in issue.

The majority concludes that Ms. Read is not taxable on the subject gains resulting from her transfer of stock to MMP.  The majority reasons that "Q&A 9 applies to Ms. Read's February 5, 1986, transfer of MMP stock and * * *, pursuant to section 1041(a), no gain

---

[1] We use the term "spouse" to include both a spouse and a former spouse.

shall be recognized by Ms. Read as a result of that transfer."
Majority op. p. 39. The majority fails to discuss persuasively the
fact that not only did Ms. Read transfer her stock to MMP, but that
MMP paid her for that stock as well, nor does the majority explain
persuasively why the capital gain that Ms. Read realized on the sale
of her stock to a third party (MMP) is excluded from her gross income
by virtue of either: (1) A statutory provision (section 1041) that
applies only to transfers between spouses or (2) a regulatory provi-
sion (Q&A-9) that extends section 1041's reach to certain transfers
to third parties on behalf of a spouse.

Congress enacted section 1041 in 1984. Before that time, an
interspousal transfer of property for adequate consideration was a
taxable transaction for Federal income tax purposes; a transferring
spouse was taxed on a transfer of appreciated property to his or her
spouse, and the recipient spouse received a basis in the transferred
property equal to its fair market value on the date of transfer. See
United States v. Davis, 370 U.S. 65 (1962). Congress enacted section
1041 to change that result. See H. Rept. 98-432 (Part 2), at
1491-1492 (1984). As enacted, section 1041 applies to defer the
recognition of gain or loss on an interspousal transfer of property
until the time that the recipient spouse transfers the property
outside of the marital economic unit consisting of both spouses
together. See Blatt v. Commissioner, 102 T.C. 77, 79-80 (1994).

There is nothing in the text of section 1041 that suggests section 1041 applies to cases such as this where one spouse transfers property to a third party and receives payment in return.

The Commissioner issued temporary regulations under section 1041 pursuant to his general regulatory authority to "prescribe all needful rules and regulations for the enforcement of this title". Sec. 7805(a). These temporary regulations consist solely of section 1.1041-1T, Temporary Income Tax Regs., 49 Fed. Reg. 34453 (Aug. 31, 1984) which, in turn, consists of 18 groups of a question and an answer. In one of these groups, namely, Q&A-9, the Commissioner set forth his position that section 1041 reaches certain "transfers of property to third parties on behalf of a spouse". Q&A-9 provides:

> Q-9. May transfers of property to third parties on behalf of a spouse (or former spouse) qualify under section 1041?

> A-9. Yes. There are three situations in which a transfer of property to a third party on behalf of a spouse (or former spouse) will qualify under section 1041, provided all other requirements of the section are satisfied. The first situation is where the transfer to the third party is required by a divorce or separation instrument. The second situation is where the transfer to the third party is pursuant to the written request of the other spouse (or former spouse). The third situation is where the transferor receives from the other spouse (or former spouse) a written consent or ratification of the transfer to the third party. Such consent or ratification must state that the parties intend the transfer to be treated as a transfer to the nontransferring spouse (or former spouse) subject to the rules of section 1041 and must be received by the transferor prior to the date of filing of the transferor's first return of tax for the taxable year in which the transfer was made. In the three situations described above, the transfer of property will be treated as made directly to the nontransferring spouse (or former spouse) and the nontransferring spouse will be treated as immedi-

ately transferring the property to the third party. The deemed transfer from the nontransferring spouse (or former spouse) to the third party is not a transaction that qualifies for nonrecognition of gain under section 1041.

Nowhere in Q&A-9, or, for that matter, in any of the other Q&A's, do we read that a gain arising from a spouse's sale of assets to a third party qualifies for nonrecognition treatment under section 1041. As we understand the majority Opinion, a spouse such as Ms. Read does not have to recognize the gain from the redemption of her stock by virtue of section 1.1041-1T(c), Q&A-10 (Q&A-10), Temporary Income Tax Regs., 49 Fed. Reg. 34453 (Aug. 31, 1984). We disagree. Although Q&A-10 does state that "The transferor of property under section 1041 recognizes no gain or loss on the transfer even if the transfer was in exchange for the release of marital rights or other consideration", nothing in that Q&A (or in any of the other Q&A's) extends that nonrecognition treatment to a transfer of property that is in essence a sale of stock by a spouse to a third party. Q&A-10 simply addresses interspousal transfers of property which otherwise would be considered sales for Federal income tax purposes; i.e., when one spouse transfers stock to the other spouse in exchange for its value in cash.

As we understand the breadth of Q&A-9, with a fair reading of our reviewed opinion in Blatt v. Commissioner, 102 T.C. 77 (1994), in mind, Q&A-9 does not reach a transfer of property by a spouse to a third party where the transfer is, in substance and in form, a sale to the third party. Rather, we believe, Q&A-9 is limited to those

situations in which a spouse transfers property to a third party in satisfaction of an obligation that is owed (or a gift that is made) by the nontransferring spouse to the third party. In the latter cases, Q&A-9 operates to tax the nontransferring spouse on the transfer to the third party, if and to the extent that the transfer is taxable, as if the nontransferring spouse had first received a gift of the property from the transferring spouse. Q&A-9 says nothing about affording similar treatment to any proceeds which are received by a transferring spouse from a third party pursuant to the property transfer.

While it is true that Q&A-9 recognizes that some transfers of property by a spouse to a third party may qualify for nonrecognition treatment under section 1041, Q&A-9 requires that the transfers must be "on behalf of" the transferor's spouse. The majority essentially takes the position that Ms. Read's transfer of stock to MMP was on Mr. Read's behalf because, the majority concludes, the redemption benefited him. We disagree. In this case, Ms. Read's transfer of stock to MMP was on her own behalf since it allowed her to cash out her interest in MMP at its appreciated value (and it allowed her to do so, under the majority's view, without any tax implications to her).

The critical fact is that Mr. Read had no obligation to MMP that was satisfied by Ms. Read's transfer of her stock to MMP. Thus, although Ms. Read may have transferred her stock to MMP at the direction of Mr. Read, we do not believe that she did so "on behalf

of" him.  In <u>Blatt</u>, we held that the redemption of Ms. Blatt's stock pursuant to a divorce decree was not on behalf of Mr. Blatt because Ms. Blatt failed to prove the redemption satisfied an obligation of his.  See <u>Blatt v. Commissioner</u>, 102 T.C. at 81-82.  We set forth an example on the top of page 81, wherein we stated that Q&A-9 operates when "H owes a debt to a bank, and W, as part of a divorce settlement, transfers her unencumbered appreciated stock to the bank in discharge of H's debt."  We stated that the redemption in <u>Blatt</u> was outside of Q&A-9 because "The redemption, in form, was a transaction between petitioner [Ms. Blatt] and corporation; she transferred her stock to corporation in exchange for its appreciated value in cash. * * *  A transfer that satisfies an obligation or a liability of someone is a transfer on behalf of that person".  <u>Id.</u>

The only reported opinion in which this Court has decided whether a corporate redemption incident to a divorce qualified for nonrecognition treatment under section 1041 is <u>Blatt</u>.  There, as mentioned above, we held that the redemption did not qualify under Q&A-9.  We recognized that the Court of Appeals for the Ninth Circuit had afforded nonrecognition treatment to a spouse who had transferred her shares to a corporation pursuant to a divorce, see <u>Arnes v. United States</u>, 981 F.2d 456 (9th Cir. 1992), but we stated that we disagreed with the opinion of the Court of Appeals for the Ninth Circuit.  We stated in <u>Blatt</u> that "any putative benefit to [Mr.] Blatt [the nontransferring spouse], such as relief from a possible claim under marital property distribution laws, does not mean that

the transfer by petitioner [Ms. Blatt] of her shares to corporation was on behalf of [Mr.] Blatt." Blatt v. Commissioner, 102 T.C. at 83. But for the Court of Appeals for the Ninth Circuit, we are unaware of any Court of Appeals that has addressed the issue of whether a corporate redemption qualifies under Q&A-9.

We conclude with a final concern about the analysis set forth in the majority Opinion. Congress enacted section 1041, in part, to remedy the "whipsaw" that occurred when one spouse failed to report his or her gain on the transfer of appreciated property to the other spouse; the Government was whipsawed because the transferee's basis in the transferred property equaled its fair market value, and the transferor, to the extent that the section 6501 period of limitations had closed, never paid any Federal income tax on the appreciated value underlying that increased basis. See id. at 79. Although the majority avoids this "whipsaw" in the instant case by concluding that Mr. Read conceded he was liable for Federal income tax on the redemption, we do not agree that Mr. Read's position in this case was a concession of liability or should be treated as one. Mr. Read's position was based on a legal analysis that the majority rejects. Mr. Read should not be held to that position after the legal principles on which his position was based are turned aside by the majority, particularly since the tax result to Mr. Read may change as a result of their analysis.

But for his "concession", the majority would have had to analyze the tax effect of the redemption on Mr. Read. Q&A-9 states that the

nontransferring spouse is taxed on the third party transfer; it does not specify when this tax arises. If, in fact, section 1041 applies to the redemption, as the majority concludes, then, under general income tax principles, Mr. Read is treated as receiving a dividend which arguably is taxable to him in 1986, the year of the redemption, rather than in the years in issue as held by the majority. See secs. 301(a), (b)(1), (c), and (d) and 302(d). See generally Bittker & Eustice, Federal Income Taxation of Corporations and Shareholders, par. 8.23 (1999 Cum. Supp. 1).[2] Thus, under this argument, Mr. Read's dividend is taxable to him in a year that most likely is closed by the section 6501 period of limitations. Under the majority's analysis, therefore, the Government may be faced once again with the very same "whipsaw" that Congress intended to remedy through the enactment of section 1041. Although the majority sidesteps this issue in this case by holding that Mr. Read conceded his tax liability as to the subject payments, that "concession" only applies to the subject years. We see no judicial or equitable reason why Mr. Read will be precluded from arguing in the future that the payments which he receives on the promissory note in other years (with the exception

---

[2] We note that the installment method of sec. 453 does not apply to the receipt of a distribution taxed as a dividend under sec. 301. The installment method may be used only to report "income" from a "disposition of property", sec. 453(a) and (b)(1), and a "distribution of property" under sec. 302(d) does not meet that requirement, see Cox v. Commissioner, 78 T.C. 1021 (1982); see generally Bittker & Eustice, Federal Income Taxation of Corporations and Shareholders, "Distributions of Corporation's Own Obligations", par. 8.23 at 8-83 to 8-84 (1999 Cum. Supp. 1).

of 1986) are not taxable to him in those years because they were properly taxable to him in 1986, the year of the redemption.

THORNTON, <u>J</u>., agrees with this dissent.